IN RE THE ESTATE OF WILLIAM THORMAN, DECEASED.

**Wills:** PROOF OF LOST WILL.   To establish a lost will the evidence 1 must be clear and satisfactory; more than the declarations of a testator is required; and, even though a will may have been made, if not found after the testators death it will be presumed to have been revoked by its destruction.

**Same:** EVIDENCE.   Although the execution and contents of a lost will 2 may be shown by the evidence of a single witness, the proof must be clear and satisfactory.   In the instant case the evidence is held insufficient to establish the execution of the alleged lost instrument and its contents.

**Witnesses:** CREDIBILITY.   That an attorney has been disbarred may be 3 shown for the purpose of discrediting his testimony as a witness,

but proof of the details of the disbarment proceeding is not admissible.

*Appeal from Fayette District Court.*—HON. A. N. HOBSON, Judge.

SATURDAY, NOVEMBER 22, 1913.

THE proponents presented a paper dated June 19, 1907, purporting to be the will of William Thorman, deceased, for probate. Objections were interposed by a son and the surviving widow, averring that another will was made about two years later and subsequently lost. Trial without jury resulted in the admission of the will first mentioned to probate. Contestants appeal.—*Affirmed.*

*John R. Bane,* for appellants.

*Guy W. Backus* and *Ainsworth & Hughes,* for appellees.

LADD, J.—Upon presentation of a paper dated June 19, 1907, purporting to be a will of William Thorman, deceased, for probate, the surviving widow, Louisa Thorman, and Albert Thorman, a son of deceased, interposed the objection that subsequent thereto, and in the year 1909 or 1910, he had made another will in the manner exacted by statute and therein had revoked the previous will and made a different disposition of his property. Owing to an antenuptial contract, Louisa Thorman was to take no interest in property left by him save the use of the homestead during life and under the first will aside from this use she was given but $1. The residue was left to the six children of a deceased daughter, share and share alike. Contestants contend that the will alleged to have been executed subsequently revoked all former wills, left $2,000 to the widow, and also the use of the homestead, and directed that one-half of the residue go to the son, Albert Thorman, and the other half to the six children

of the deceased's daughter. No pleading to these objections was essential, for, to defeat the first will, the last, which is alleged to have been lost, must have been fully proven, and the issues raised were: (1) Whether it had ever been made; and (2), if so, whether it had been merely lost or purposely destroyed.

To establish a lost will or prove its contents, the evidence must be of a very clear and satisfactory character. *McCarn v. Rundall*, 111 Iowa, 406; *Thomas v. Thomas*, 129 Iowa, 159; 

1. WILLS: proof of lost will. *In re Will of Brown*, 143 Iowa, 649. Something more than the declarations of the testator is essential to accomplish this. *In re Will of Dunahugh*, 130 Iowa, 692; *In re Will of Brown, supra.* And though a will may have been made, if not found after the testator's death, it is presumed to have been revoked by destruction. *Thomas v. Thomas*, 129 Iowa, 159. A careful examination of the record has convinced us that the evidence is not of that conclusive character the law exacts to warrant the establishment of a lost will.

C. H. Rohrig testified that deceased engaged him to draw a will; that he went to his house and there made a memorandum of the conditions proposed; and in this he is somewhat 

2. SAME: evidence. corroborated by Mrs. Thorman, who remembered of him having been there and that she heard the word "will" spoken by Rohrig, who asked her if she would sign. According to Rohrig's testimony, he went to his office, prepared the will, and deceased signed it in his presence and that of Doctor, both of whom signed as witnesses, and quoting:

As I recollect I called in Roy Doctor (L. J.) to witness the will. For the last three or four years we have been in the same building and on the same floor in the Glass Block. Mr. Doctor was working for the First National Bank across the street before that time. My recollection is he was on that floor because I don't remember of ever calling him from the bank. I gave the will at the time I finished it to William

Thorman and have not seen it since.  My attention has been called to the finding of the will before his death.  I think about a week before his death Mrs. Beckkemmer and Mr. Thorman's wife came to the office and asked me whether I had his will.  I looked through all the papers I had, through the safe and everywhere, and I was satisfied I didn't have it and hadn't had it and I told them I would look into it. I have searched twice for it since and I couldn't find it.  I don't know now where it is.  I don't remember distinctly of giving him the will after it was executed.

But Doctor was not certain about having witnessed such a will.  His office was on the same floor and Rohrig had called upon him to witness several wills, but though according to his recollection he had signed a will of Thorman, as witness, he was not sure.  He testified:

The first will I recollect was a man that lives over northwest of Oelwein, by the names of Thiel, and he called me in, and as I remember, of course I can't absolutely swear to it, but he called me in there one day and I remember it was Mr. Thorman's.  He went to introduce me to this man and I told him I knew Mr. Thorman (that is, I was not personally acquainted with him but I knew him on sight and knew him when I saw him), and I think it was Mr. Thorman's, was the other will, although I can't absolutely swear to it.  The man that was in there, if it was Mr. Thorman, I saw sign the will; my best recollection is Mr. Rohrig signed the will and I signed as second witness. . . . I can't absolutely swear it was Mr. Thorman, but to my best recollection and belief . . . it might have been some other man but I don't remember of anybody else.

Rohrig recited the substance of his conversation with deceased and gave his recollection of the contents of the will, though he was unable to say whether it was drawn in 1909 or in 1910.  He had prepared a will for him in 1903 or 1904.

It appears from the testimony of Mrs. Thorman that her husband had habitually kept all his papers in a tin box, the

key to which he carried with him, and during the period in question customarily did his legal business with Backus. The latter was there shortly before Thorman's death, when, according to this witness, Robert Medaus, a boy thirteen years old, who was boarding there and going to school, he came in, said Albert should have most, and turning to his wife declared there was plenty left for her. The widow related farther that later Backus told her there were two wills and asked her to go and inquire of Rohrig. Accompanied by Mrs. Beckkemmer, she did so, and Rohrig said a will was prepared by him, but upon diligent search he was unable to locate it. In the evening she told deceased there were two wills and in the morning she accompanied him to the Ætna Bank in Oelwein. By his direction she got Backus, and the latter wrote an order on the clerk of court directing him to deliver all Thorman's wills to Backus and deceased signed it. The clerk could find only the will of 1907. But she testified that deceased had told her he had made another will and further:

He said that man (Backus) wrote the first will and I saw the other man come and write it in the house; that is all I know. I took Mr. Thorman's word for the first one and I saw the second one written, but didn't see it signed because they both went away to town together. Mr. Thorman didn't deny it. He told me there were two wills and he told me there was plenty left there for me in the second will. The night before he went down to see Mr. Backus, Mr. Thorman and I had conversation about the wills; he said he hadn't given any. I says: 'William, that is a mistake. Haven't you said you had, and I saw one written on the table.' After that he got up; he didn't say anything; he went right down to the bank and I followed him. I said he had made two wills. Q. And he said he hadn't? A. Well, he said he had said before he had made one long before that; he had said he had made this will and told me so. Q. Did Mr. Thorman say that Mr. Rohrig made a will for him which he wrote on the table? A. Mr. Rohrig said, 'Will.' Mr. Thorman didn't because I didn't understand him. (Transcript 93, 94.) Q. Now any time after that did Mr. Thorman say that Mr.

Rohrig had made a will for him? A. Yes, he did. He said this, it must have been a month or so before he died. (Transcript 94, 95.)

It will be noted that contestants necessarily relied solely on the testimony of Rohrig not only to prove the contents of the alleged lost will but that the same was properly witnessed, for Doctor was not at all certain as to the will he signed as a witness, being that of deceased. Though the execution and contents of a lost will may be established by evidence of one witness, these must be clearly and satisfactorily proven. *Tynan v. Paschal,* 27 Tex. 286 (84 Am. Dec. 619) ; *Matter of Page,* 118 Ill. 576 (8 N. E. 852, 59 Am. Rep. 395) ; *Graham v. Birch,* 47 Minn. 171 (49 N. W. 697, 28 Am. St. Rep. 339).

It may be that Rohrig prepared a draft of a will for the deceased, but there are several matters which cast doubt upon whether the will was actually executed. There are many circumstances tending to contradict his story: (1) He handed the instrument to the deceased, who carries it away, and it has not since been found; (2) the testator habitually kept his papers in a tin box and this will was not found among them; (3) during the period in question, Backus rather than Rohrig habitually attended to his legal business; (4) the testator prior to his death denied that there was another will and, upon being informed that there was one, immediately began a search for it indicating that he had not supposed that there was such an instrument; (5) he must have learned before his death that no other will could be found, and, had he supposed that this last will had been lost, he would likely have executed another; (6) and, moreover, the credibility of Rohrig was much impaired by the showing that he had been disbarred.

On his cross-examination he was required to answer over objection as to whether he had been disbarred from the prac-

tice of law and whether he had been reinstated. That he had been disbarred was a fact tending to discredit him as a witness, as such an order likely would not have been made but for satisfactory proof of professional misconduct. *Lansing v. Railway*, 143 Mich. 48 (106 N. W. 692); *People v. Reavey*, 38 Hun (N. Y.) 418. That the different specifications on which disbarment was adjudged may not be shown appears from *People v. Dorothy*, 156 N. Y. 237 (50 N. E. 800). Under our statute, a witness may be interrogated as to previous conviction of felony. Section 4613, Code. Or this may be proven by the record. The object of such evidence is to disclose facts in the witness' career having a tendency to impair his credibility. The real objection to this class of evidence is that the acts of others, rather than those of the witness, are given weight as affecting his credibility. See *People v. Dorothy*, 20 App. Div. 308 (46 N. Y. Supp. 970), where proof of disbarment was not deemed admissible. In *Smith v. Castles*, Gray (67 Mass.) 108, the details of disbarment proceedings were sought to be shown by cross-interrogatories, and the court held this improper but did not decide that proof of disbarment might not be received. Here the witness was testifying to the performance of professional work, and it was proper on cross-examination to elicit whether he was still engaged in the practice of his profession, and, if not, the occasion for his discontinuance. It was as though he had been asked whether he was a member of the profession and the occasion for ceasing to be such, and we are of the opinion that there was no error in eliciting testimony on cross-examination.

3. WITNESSES: credibility.

Certainly the deceased did not understand that he had executed a will subsequent to that tendered for probate, and, in view of this and other circumstances enumerated, we are of opinion that the contestants failed to establish its execution in that clear and satisfactory manner exacted by law. We are the more inclined to this conclusion for that was reached by the trial court which possessed and had better opportunities

to pass upon the credibility of the witness, who testified orally.

The judgment admitting the first will to probate is *Affirmed.*

WEAVER, C. J., and EVANS and PRESTON, JJ., concur.