H. H. MILLER, Appellee, v. HARRY MILLER et al., Appellants.

**WILLS:** Probate—Lost Will—Required Evidence. Evidence sufficient to probate a lost will must clearly and satisfactorily establish (1) the due execution, and (2) the contents, of such will; and such rule is not relaxed by the fact that such will was last seen in the possession of the testator's wife. Evidence held insufficient.

Headnote 1:   40 Cyc. p. 1297.

Headnote 1:   28 R. C. L. 380.

*Appeal from Lucas District Court.*—F. M. HUNTER, Judge.

OCTOBER 26, 1926.

REHEARING DENIED APRIL 7, 1927.

An action in equity to establish and probate a lost will. From a decree probating said lost will, appeal is taken.—*Reversed.*

*J. A. Penick, W. W. Bulman,* and *G. C. Stuart,* for appellants.

*Dan Steck* and *J. W. Kridelbaugh,* for appellee.

ALBERT, J.—By way of preliminary statement, it may be said that Henry M. Miller was a resident of Lucas County, Iowa, for many years. His family consisted of his wife, Martha E. Miller, his son, Harry Miller, and his daughter, Mary E. Ream. He was possessed of two farms in that county, one of 300 and one of 400 acres, approximately. He lived on what is designated in the record as the "home" or "south" farm, consisting of about 300 acres. He died on the 25th day of September, 1923. His wife predeceased him, on the 15th of January, 1923. Harry Miller, the son, was married, and had one child, a son. Mary Ream, the daughter, was also married, and had one child, known in the record as Miller Ream. These were the respective families during all of the time of the controversy herein.

The petitioner herein offering for probate the alleged lost will was H. H. Miller, the son of Harry Miller, and the contestants were Harry Miller, Mary Ream, and Miller Ream.

In 1907, the said Henry M. Miller was determined to be insane, and was later confined in a sanitarium, where he remained practically until the time of his death. His wife was appointed guardian, and continued to act as such until the time of her death; whereupon the court appointed one Goodkin, who served as such guardian until the death of the said Henry M. Miller.

It is the claim of plaintiffs that in 1905 the said Henry M. Miller made and executed the purported will which is sought to be probated herein as his last will. This will is known in the record as the "Bartholomew will." The answer of the respondents is:

(1) They deny the existence of the Bartholomew will, and (2) they say that, if it ever did exist, it was specifically revoked by a later will made by the said Henry M. Miller in the spring or early summer of 1906, which will was claimed to have been drawn by T. M. & C. W. Stuart, who were father and son, practicing law together. This will is referred to in the record as the "Stuart will," and is claimed to have contained, among other provisions, the following:

"Hereby make and declare the following to be my last will and testament and hereby revoke any and all former wills by me made at any time."

This is a general outline of this contest. The district court held that the Bartholomew will was sufficiently established, and that there had been a failure to sufficiently prove the existence of the Stuart will, and therefore admitted the Bartholomew will to probate.

There are some well established principles of law that control cases of this character. The burden of proof is on the proponents to establish two things:

1st. That the will was executed as provided by law.

2d. Its contents.

In each instance, both of these matters must be established by clear and satisfactory evidence. *In re Will of Dunahugh,* 130 Iowa 692, at 696; *McCarn v. Rundall,* 111 Iowa 406; *In re Estate of Thorman,* 162 Iowa 237.

We turn now, to the record, to determine whether or not the appellee successfully carried this burden. He tendered by his pleading the will which was lost, the material part of which he said was a "bequeathing and devising of all of his property, both personal and real, as follows: An undivided one-half interest in all of his said property to Mary Ream, with remainder over to Miller Ream; an undivided half interest in all of said property to Harry Miller, for his use and benefit during his lifetime only, and at his death to pass to and become the property of the plaintiff, H. H. Miller."

Later, he withdrew the above allegations, and by way of amendment, says that H. M. Miller in his will disposed of. his property as follows: "To Harry Miller a life estate in and to what was known as the 'north place' or farm, and at his death the same should go to the heirs of the said Harry Miller. To Mary Ream, the 'south' or 'home place,' a life estate, and at her death, to her heirs, if any." He further alleges that any other property of which the said Henry M. Miller might die possessed was devised in equal shares to Harry Miller and Mary Ream during their lifetime, and at their death to their heirs, if any.

To support his position, appellee introduced one L. E. Bartholomew, who at one time practiced law with his father at Chariton, and who is now vice-president of the Bankers Trust Company, of Des Moines. He testifies that he was acquainted with Henry M. Miller, who appeared at their office in 1905 or 1906, and that his father and he together drew a will for the said Miller, but that the same was not signed by Miller in the witnesses' presence; that Miller left their office, saying that he was going to the First National Bank to have it signed; that the witnesses never saw the purported will afterwards. He said:

"It is impossible for me to state absolutely what was in that will. I simply had a remembrance—that is, I think I do—of the contents of the will generally, but I would not say absolutely what was in it, at this time. My remembrance was that he had two farms; that he gave a life estate in one of the farms to his son, with remainder fee in his grandson, to his son's son, and the other farm was given to his daughter,—a life estate to the daughter, and the remainder or fee to her child."

He testifies that he doesn't remember which farm went to the son or which to the daughter; that the wife (Henry Miller's) was to have the use of the property for her lifetime; that he cannot remember whether there were any easements given to either Mary Ream or Harry Miller over or across any part of the farms. Being pressed, he further said:

"I cannot state absolutely what was in that will. I can give you my remembrance of it,—that is, my recollection."

This would not be the will described in the amended petition, as it varies greatly therefrom.

Mrs. Barbara Daugherty says that she is a physician and surgeon, and has lived in Chariton since 1889, where, together

with her husband, she ran a drug store; that she knew Henry M. Miller in his lifetime, and his children, and that her husband in a professional way attended Henry M. Miller; that Miller was a frequenter of the drug store, and that she saw him, off and on, from the date of his mental trouble, in 1907, until his last illness, in 1924; that the witness, with the wife of Henry M. Miller, went to the First National Bank and got some papers and brought them down to her place of business, and the wife gave them to the witness, to put in the safe, which she did; that among these papers, mostly insurance papers, the witness says, was the will of Henry M. Miller; that this was on February 5, 1908, after the failure of the First National Bank; that they remained in her possession until March 28, 1914, during which time they were kept in her safe, to which no one had access, except herself and her husband; that T. M. Stuart and Corwin Stuart both saw this will while it was in witness's possession; that T. M. opened it and read it; and that later, at the request of Harry Miller, witness read the purported will. As to the contents of the will, she said:

"He left it to his wife during her lifetime, to revert to his son and daughter, as nearly divided as he could divide it, and at their death to revert to their heirs, if any. If no heirs, to revert back to the estate."

Witness said she thought she was giving practically the exact wording of the contents of the will, because she read it two or three times for that one purpose, and should know. Being recalled, she testified that "the home place was to go to Mrs. Ream, and the place that Harry always lives on was to go to him;" that the will described the places by sections, quarters, etc., but she cannot say whether the will used the term "home place" or not. The witness did not know which is the "north" and which is the "south" place, but says:

"As you come from Derby on the right-hand side of the road is the old place which Mrs. Ream got, and Harry got the place on the left-hand side of the road."

She says that the will also contained a clause that a certain road was to be maintained through the farm that Harry got. In a deposition by this witness, taken at some time previous, she stated:

"The home place was the place the Millers were living on,

and the place that Harry was living on was given to him, but the will did not contain any words of that kind. It did not describe the farm in words. I did not take the legal description of the land and go over it on the map. Don't know what sections or townships the land was in, or what quarter sections, if any, were given to Harry Miller. I don't know the legal description of the land given to Mrs. Ream. The will did not say that he gave Mrs. Ream the place Millers lived on, or the place south of the road. I didn't take the will and go over the land with the will and see what land was given to one and what given to the other. I didn't count the number of acres that the will gave to Harry.''

''Q. Did the will itself state how many acres were given to Harry and how many were given to Mrs. Ream, or was it a government description? A. It was government description. At the time I opened the will and read it and told Harry Miller its contents, I learned from him as to which farm was left to him and which to his sister. Harry said he was to get the one that he always lived on, and his sister was to have the old place. The will did not specifically state as to whom the road was to be used by, that was mentioned in the will. It did not say anything about a public road.''

E. W. Drake testifies that at one time he was the partner of O. A. Bartholomew, and that in 1913 O. A. Bartholomew told the witness about the contents of the will of Henry M. Miller, and that he saw the will in the office of Mr. Daugherty; that he thinks he read it clear through, and would not say who the witnesses were; that Henry Miller's name was signed to the will; that he cannot recall the wording of the will; that Harry Miller and his sister were to receive a life estate in that farm,—in that land; that the remainder was to go to their children, share and share alike, as he understood it.

''I think there was a provision that the wife should have the proceeds of the farm during her life, but I don't say that I know the signature of Henry M. Miller. I don't say whether he signed that will or not.''

It is true that the testimony of Corwin Stuart is that he saw the will in the hands of Mrs. Daugherty and made a sketch of the contents of the will, but that it was not taken down verbatim. He says that it purported to be signed by Henry M.

Miller, and that he did not recollect who the witnesses were; that he is not now and never was acquainted with the signature of Henry M. Miller. Witness stated that he had lost the memorandum that he had taken of the contents of the Bartholomew will, and he does not in his testimony attempt to give the contents thereof. T. M. Stuart was dead at the time of trial.

This is the sum total of the testimony on behalf of the proponents as to the contents of the lost will, and to our minds it falls far short of carrying the burden of proof that was on the proponents. . . .

As to the due execution of the will, the witness Bartholomew testifies that, after the purported will was prepared in their office, it was taken therefrom, without having been signed by H. M. Miller, and that he never saw it afterwards. Witness Drake says he did not know the signature of Henry M. Miller, and did not know whether Miller signed that will or not. W. P. Beem, who it is claimed was one of the witnesses signing the will, testifies that he has no recollection whatever of having signed the will, or that Henry Miller asked him to sign it, or that he had any business with Miller in connection with the will at any time. The witness Stuart, who saw the purported will, testifies that he was not acquainted with the signature of Henry M. Miller. Witness Daugherty says that the will was signed by witnesses; that Henry M. Miller's name appeared to be signed to the will.

"I think I was acquainted with his signature. He owed us, and paid us by check. I have seen his signature a great many times. I have no doubt whatever but that it was Henry M. Miller's signature. While we had done business with him, I cannot say that I could positively identify his signature. He at times owed us, and paid us with check. I have seen his signature a great many times, during all the years he traded with us. I think I was acquainted with his signature. Frank Crocker and W. P. Beem's signature purported to be attached to the will as witnesses. The will was dated June 5, 1905. Crocker was then cashier of the First National Bank, and Beem was assistant cashier of the same bank. It certainly was the signature of Mr. Crocker. I was acquainted with the signature of W. P. Beem. Mr. Crocker is not living. I gave my deposition in this case sometime before the trial, and was then asked, 'Q. Were you

familiar with the signature of Henry Miller?' and I answered, 'I have seen his signature. Don't know as I could.' 'Q. Did you pay any particular attention at that time to this signature on the will, for the purpose of telling whether it was the genuine signature or not? A. No, sir, I did not. I don't say I know Henry Miller's handwriting on the will. I am not an expert in handwriting. I didn't make the statement that I had seen him write his name. Never saw his name on any note or contract or any instrument outside of this will. Wouldn't say about some checks that he had written. I won't even swear for sure that he gave me a check. We did lots of business for Mr. Miller,—outside of that I cannot say. I wouldn't even swear that I ever saw a check with his name on it.' "

Witness was then presented with certain exhibits (checks), and asked whether any of them were in the handwriting of Henry M. Miller. She answered, "I could not testify on any of those. I am not a handwriting expert. You produce the will and I will tell you."

Witness Drake refers to the will's being witnessed, but does not purport to testify as to the genuineness of the signature of the witnesses. He says:

"I could not swear as to who the witnesses were, or their signature."

This constitutes the substance of all the testimony of all the witnesses with reference to the execution of the will. It is to be noticed, therefore, from this testimony that, if the Bartholomew will is to be admitted to probate, such action by the court must be based largely, if not wholly, upon the testimony of the witness Daugherty. Her testimony is in conflict with the evidence of some of the other witnesses introduced on behalf of the plaintiff, and there are some other things in the record which tend to weaken her testimony, if not to make it wholly unreliable. With this situation of the record, under the rule that we have heretofore laid down, the proponents have not carried the burden of showing the due execution of the will and its contents by such clear, satisfactory, and convincing testimony as the law requires.

It is insisted, however, on behalf of appellee, that, where a will is fraudulently secreted or destroyed, the strict rule of clear and satisfactory proof of its date and legal execution is relaxed, and its provisions need only to be proven in general terms. If

we assume, without deciding, that this is a correct statement of the law,—that, if a will is fraudulently destroyed, every presumption as to its contents and its date and as to whether or not it was the testator's last will must be resolved in favor of the proponents, and that the evidence in support of such will must be given the most favorable construction, under such circumstances,—it is necessary to prove its provisions in general terms only. This question is quite thoroughly discussed, and generous briefs furnished on both sides; but the question is whether it has any application to the facts before us. The evidence satisfactorily shows that, the last time this purported will was ever seen, it was in the hands of Martha E. Miller, after she had been appointed guardian of her husband. As such guardian, she, of course, would be entitled to the possession of the same, and the mere fact of possession, under such circumstances, would not militate against her. The rule, as contended for by appellee, in substance is that, when the instrument in controversy has been traced into the hands of an adverse party who could benefit by its destruction or suppression, then the requirements as to quantity of proof in such cases are relaxed. If we apply this to the present situation, Martha E. Miller was dead prior to the commencement of this action. Had she outlived her husband, under the Iowa rule she would have had an absolute right to take her one third of his property, or she could take a life estate under the terms of the will, if such will existed. Since she would be perfectly free to thus choose between the two situations, what would it profit her to destroy this will? Since she is not a party to the action, how can it be said that she was adversely interested?

We do not feel that the facts in the case, as developed by the testimony, produce such a situation as would make the rule contended for by appellees available to them. We are content to hold that the case made must be controlled by the rule above announced by us in this opinion as to the quantity of proof required to admit the alleged lost will to probate, and, having failed to supply that amount of proof, the proponents must fail in their action.

By reason of this holding, we do not discuss the question of a subsequent revoking will.—*Reversed.*

DE GRAFF, C. J., and EVANS and MORLING, JJ., concur.