## Griffith v. Bergson, Admr.

*John V. Diggins,* for plaintiff.
*Greer & Johnson,* for defendant.

SWENEY, J., July 31, 1945.—Plaintiff, David R. Griffith, Jr., brought.this action in assumpsit against original defendant, Emma C. Bergdoll, seeking a recovery for the reasonable value of legal services alleged to have been rendered by plaintiff to defendant. The suit also included a claim for sums of money advanced by plaintiff as costs in defendant's behalf.

Subsequent to the institution of the suit, Wilbur F. Whittle was appointed guardian for Emma C. Bergdoll. An affidavit of defense was filed by the guardian in which he averred lack of knowledge concerning the facts upon which plaintiff based his claim, and that "the means of proof of such facts are under the exclusive control of plaintiff because the said Emma C. Bergdoll is now feeble-minded and is unable to recall, and has no records of, the facts therein averred". The

affidavit of defense also pleaded the statute of limitations.

The case has been tried twice. Both trials were before the writer hereof and a jury, and both resulted in a substantial verdict for plaintiff. Since the last trial, original defendant and Wilbur F. Whittle, the guardian, have both died, and the administrator of Mrs. Bergdoll's estate has been substituted as defendant.

There has never been any question in the case that the plaintiff did render valuable legal services to Mrs. Bergdoll over a period of time beginning in the year 1927 and ending in June of 1933. However, since this action was not commenced until June 26, 1941, and the statute of limitations was pleaded, it became incumbent upon plaintiff to prove facts sufficient to remove the bar of the statute, assuming, of course, that the jury accepted plaintiff's testimony that he had not been paid for his services. See McPhilomy v. Lister, Executrix, 341 Pa. 250. To support that burden, plaintiff offered proof of a payment on account by Mrs. Bergdoll in circumstances which will be later detailed.

Following the first trial of the case, we were all of the opinion that the evidence in the record was clearly insufficient to toll the running of the statute. We therefore granted original defendant's motion for a new trial. See our opinion and order dated May 19, 1943. (No motion for judgment n. o. v. was filed, as in McPhilomy v. Lister, supra.)

The case is now before us on the guardian's motion for a new trial following the second verdict for plaintiff. The guardian also filed a motion for judgment n. o. v., but this motion, apparently, is not pressed. As grounds for a new trial, it is urged, inter alia, that the verdict of the jury is against the weight of the evidence, and that the trial judge erred in various rulings on the evidence, and in his charge to the jury.

We are of opinion, after a prolonged review and consideration of the case, that there is merit in one or more of the guardian's contentions, and that the interests of justice require us to sustain the motion and award a new trial.

It is unnecessary to review the evidence at any great length. Plaintiff was his own principal witness. His claim for compensation was for services performed in connection with some 25 specific pieces of litigation in which Mrs. Bergdoll was involved during a somewhat eventful period of her life. There was also a claim in the sum of $1,750 for miscellaneous services, not identified with the particular matters referred to, extending over the entire period from May of 1927 to June of 1933. Plaintiff had presented to Mrs. Bergdoll separate bills, dated July 1, 1933, setting forth in some detail the services performed by him in the various suits in which he had appeared as counsel in her behalf. These bills were produced by the guardian at the trial of the case, and were introduced into evidence by plaintiff.

Plaintiff testified at considerable length concerning his professional relations with Mrs. Bergdoll; and reviewed in sufficient detail his activities in connection with the litigation in which he represented her, and the nature and character of the services which he performed in her behalf. We may say, in passing, that plaintiff appears to have exhibited commendable zeal and industry in the representation of his client's interests, and to have discharged the duties of his employment with reasonable skill and fidelity, considering the nature of much of the litigation.

The evidence relied upon by plaintiff to toll the statute may be briefly stated. He testified that on or about July 5, 1935, as attorney for Mrs. Bergdoll, he received a check drawn to their joint orders in the sum of $1,498.89; that this was received in settlement of a claim which Mrs. Bergdoll had against the estate of an

attorney who had formerly represented her. As we understand the testimony, plaintiff called to see Mrs. Bergdoll at her home on that same evening, taking the check with him. Mrs. Bergdoll, previous to this occasion, had refused to accept other checks, substantially the same in amount, which had been tendered in settlement of the claim. According to the plaintiff's testimony, Mrs. Bergdoll was at first reluctant to accept the check, and there was considerable discussion between them concerning the matter; however, he finally "persuaded" Mrs. Bergdoll to accept the check in settlement of her claim. Plaintiff testified, in effect, that he had with him copies of his bills for services, and that he submitted them to Mrs. Bergdoll one at a time; that she approved each and every one of the bills. (These copies of the bills were not offered in evidence at the trial.) Plaintiff testified that after Mrs. Bergdoll endorsed the check, she delivered it to him as a payment on account of all of the bills, and that the proceeds were apportioned among "all the several claims".

On June 27, 1935, eight days, be it noted, prior to plaintiff's alleged conference with Mrs. Bergdoll of July 5, 1935, the Court of Common Pleas No. 5 of Philadelphia County entered a decree of disbarment against plaintiff. The trial judge's refusal of defendant's several offers of proof of plaintiff's disbarment constitutes one of the principal reasons assigned by defendant in support of the motion for a new trial. It is urged that the evidence was competent for two purposes: First, to impeach plaintiff's credibility generally; and, second, as affecting the credibility of his testimony that he conferred with Mrs. Bergdoll and persuaded her to accept a check in settlement of a case, and thus, in effect, engaged in the practice of law, subsequent to his disbarment. Defendant says in the brief of argument:

"It would be of importance for the jury to know whether Griffith would dare to flaunt (flout?) the order of the court and to practice law and confer with clients, and argue for acceptance of a settlement at a time when he was disbarred."

In 70 C. J., Witnesses 857, §1064, the general rule is set forth as follows:

"An attorney who is a witness may be impeached by showing that he has been disbarred; but it is not permissible to go further and show the reasons therefor; nor, it has been held, is it proper to show that the attorney has resigned his license."

In our own State, there appears to be a singular dearth of authority on the precise point. We have found but one case in which the question was considered. In Burke et al. v. Harkins et al., 296 Pa. 414, a proceeding in equity to reform a deed, an attorney who had acted as such for both parties to the transaction, testified at the hearing before the chancellor. In discussing the credit to be given this witness' testimony, the court said (p. 420-421):

"With like reason the evidence of Weil was deemed untrustworthy. He had acted as attorney for both parties. . . . As affecting the weight to be given his testimony, it was proper for the court to consider that he had been guilty of such gross misconduct as to cause his disbarment by the Orphans' Court and Common Pleas of Allegheny County: Weiss v. London G. & A. Co., 285 Pa. 251; Lansing v. Michigan Central R. R. Co., 143 Mich. 48, 106 N. W. 692; Thoras's Est., 162 Iowa 237, 144 N. W. 7; People v. Dorthy, 156 N. Y. 241, 50 N. E. 800; 40 Cyc. 2612. Though the record of the disbarment proceedings was offered showing his dismissal, the objection to the reception of such testimony was placed on the ground that it did not show conviction of a crime. It may be that proof of the facts which caused his exclusion from further practice as an attorney, might have been objectionable if pre-

sented to a jury passing on the credibility of the witness (People v. Dorthy, 63 N. Y. Supp. 592), yet the evidence was here submitted to a chancellor only, and it appears that both the trial judge and the court en banc considered alone the fact that a final order of disbarment had been entered. See Liggett's Petition, 291 Pa. 109."

At the oral argument, counsel for plaintiff contended that, in the case cited, the court held that the evidence of disbarment was proper only because the proceeding was before a chancellor, and that such evidence would have been improper if presented to a jury. We think, however, that a careful reading of that portion of the opinion will show that the court was saying that it was *proof of the facts which caused the disbarment* which might have been objectionable if presented to a jury passing on the credibility of the witness. We have no doubt that proof of the fact of plaintiff's disbarment, without more, was admissible. It does not necessarily follow, of course, that the rejection of such proof was error. We think the matter is one which lies largely within the discretion of the trial judge. After thorough consideration, however, we are of opinion that, in the unusual circumstances of the case, the evidence should have been received. Owing to her physical and mental condition, Mrs. Bergdoll was unable to appear in court at either trial. As we have said before, plaintiff was his own principal witness. He was, it goes without saying, vitally interested in the outcome of the case. He was testifying to the performance of professional work: See Thorman's Est., 162 Iowa 237, 144 N. W., 7. 9. His testimony on a most vital phase of the case, that relating to the alleged tolling of the statute of limitations, was absolutely without corroboration. In addition, we are compelled to say that a serious question arises as to plaintiff's credibility, and the weight to be given his testimony, owing to what we regard as a manifest

inconsistency between plaintiff's testimony at the first trial and that at the second, so far as it relates to a most important part of the case. We refer again to that part bearing on the tolling of the statute. We do not propose to lengthen this opinion by further discussion of the point. Those interested will have no trouble discovering the inconsistency. We will say, however, that if the actual facts of the transaction of July 5, 1935, between plaintiff and Mrs. Bergdoll were as testified by plaintiff at the *second* trial, then it seems incredible to us that he would not have acquainted his counsel with the actual facts prior to the first trial, or that he would not have testified to those facts at the first trial.

In sum, we think that the refusal of the trial judge to admit proof of the plaintiff's disbarment, was so prejudicial to defendant's interests as to require the award of a new trial.

Since the case must be tried again, it is appropriate to consider another question raised by defendant in the motion for a new trial. We have indicated earlier in the opinion that a guardian was appointed for Mrs. Bergdoll under the Act of May 28, 1907, P. L. 292. The appointment was by decree of this court dated November 12, 1942, to no. 987, June term, 1942, which was prior to the first trial of this case. It is defendant's contention that the entry of this decree rendered the plaintiff incompetent as a witness, under section 5(e) of the Act of May 23, 1887, P. L. 158, 28 PS §322, which is as follows:

"Nor, where any party to a thing or contract in action is dead, or has been adjudged a lunatic and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest in the subject in controversy, shall any surviving or remaining party to such thing or contract, or any other person whose interest shall be adverse to the said right of such deceased or

lunatic party, be a competent witness to any matter occurring before the death of said party or the adjudication of his lunacy . . ."

We may say, in passing, that it is doubtful whether Mrs. Bergdoll's "right" had passed to a "party on the record", within the meaning of the act. So far as we can ascertain from the record, her guardian was not substituted as a party defendant on the record. Be that as it may, the act, in so many words, makes the adjudication of lunacy the disqualifying factor. The true distinction between lunacy and other forms of mental aberration is to be sought, perhaps, in the more abstract devolutions of scientific thought. We are convinced, however, that a decree under the Act of May 28, 1907, P. L. 292, is not the equivalent of an adjudication of lunacy, for purposes of the Act of 1887.

When the Act of 1887 was passed, an inquisition in lunacy under the Act of June 13, 1836, P. L. 589, was the only method known to our law whereby a person could be adjudged a lunatic. And this is one of the circumstances in the light of which it is to be read, especially since its language is clear and unambiguous, and its general purpose was to make competency the rule and incompetency the exception. See James v. James, 2 D. & C. 123.

The purposes of the Act of 1836 are to control the care and custody of the lunatic's person, and to safeguard his estate, if he has one: James v. James, supra. Section 67 of the Act of 1907, 50 PS §706, in effect, defines the word "lunatic" as a "person of unsound mind". And it is to be noted that section 20 of the act, 50 PS §753, makes provision for the care and management of the "real and personal estate" of the lunatic. Amongst the duties of an inquisition is to inquire how long the alleged lunatic has been such, if he is so found by them, and if he enjoys lucid intervals: James v. James, supra, p. 125.

The Act of June 25, 1895, P. L. 300, the predecessor of the Act of 1907 (Arthur's Case, 136 Pa. Superior Ct. 261, 264), was the first so-called "weak-minded persons" act. It was enacted, as its title shows, "For the protection of persons unable to care for their own property", and applied to but a single class, who were defined by it as so "weak in mind" as to be utterly unable to do so. Neither it nor its amendment of June 19, 1901, P. L. 574, contained any provision relating to the care of the person. Both had for their sole purpose the protection of property: James v. James, supra. Speaking of the Act of 1895, the court, in Sunderland's Est., 14 Dist. R. 257, said (p. 257):

"The legislature . . . undoubtedly distinguished between a lunatic and a weak-minded person, for otherwise there would have been no occasion for the Act of 1895. When the Act of June 13, 1836, P. L. 589, which provided for cases of unsoundness of mind, was passed, the word 'lunatic' had a defined meaning, and did not include mere weakness of intellect or a disposition to squander an estate. It was assumed that a person might be sane and yet unable to properly care for his property, although he might of his person."

The Act of 1895 was intended to operate *prospectively*. In Gorgas v. Saxman, 216 Pa. 237, the court said, speaking of that act (p. 239):

"It will be observed, however, that a proceeding under the provisions of that act is different in scope and character from one de lunatico inquirendo. It is an act intended for the protection of persons unable to care for their own property, and is not so far reaching as a proceeding in lunacy. The power to find how long the person hath been weak-minded, and to make decrees regarding the disposition of property made prior thereto, is not conferred by the statute. It is apparent that the act was intended to operate prospectively, in order to protect a person, *not a lunatic*,

nor an habitual drunkard, but weak-minded, against his own improvidence thereafter." (Italics supplied.)

And in Hoffman's Est., 209 Pa. 357, the court spoke of the Act of 1895 as establishing "a legal status or condition, intermediate between normal mental capacity and insanity or idiocy, a state of weak or enfeebled mind, neither mens sana nor non compos mentis" (p. 359).

The Act of May 28, 1907, P. L. 292, 50 PS §941, et seq., simply enlarged the scope of the Act of 1895.

"The field of operation of the Act of 1895 was greatly extended by that of May 28, 1907, P. L. 292, without, however, working any material change in its underlying beneficent purpose, the protection of the property of unfortunates against their own improvidence. Inability to care for such property still continues the test. The classification of such persons is much enlarged by the later act. It now embraces those who are 'insane or feeble-minded or epileptic or so mentally defective' as to be unable to care for their property": James v. James, 2 D. & C. 123, 125.

It was under this act that, after hearing, this court, in a decree of our President Judge, found "that the said Emma C. Bergdoll, due to the natural consequences of longevity and old age, has become so enfeebled of mind and defective mentally that she is unable to take care of her property and in consequence thereof, is liable to dissipate and lose the same and to become the victim of designing persons". Mrs. Bergdoll was not, however, either expressly or by necessary implication, adjudged to be a lunatic or insane. The decree had, and could have had, nothing to do with her custody. It merely safeguarded her property.

The decree was not, therefore, an adjudication that Mrs. Bergdoll was a lunatic within the meaning of the Act of 1887. While it may be argued, logically, that the law should afford the same protection in cases where a guardian is appointed under the Act of May

28, 1907, P. L. 292, as in those involving lunatics and deceased persons, that is a matter for the legislature. The language of the section is plain and unambiguous and conveys a clear and definite meaning, and there is no occasion for resorting to the rules of statutory interpretation and construction. It must be given its plain and obvious meaning: Commonwealth ex rel. Cartwright v. Cartwright et al., 350 Pa. 638, 645.

"It [the Act] should not be extended beyond its express terms, especially as it makes no mention of habitual drunkards, who, at the time of its passage, equally with lunatics, enjoyed the protection of the law, and it used the words 'adjudged a lunatic' advisedly: Com. v. Loomis, 270 Pa. 254, 259": James v. James, supra, p. 126.

"When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit": article IV, sec. 51, of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551.

The case of Hickey v. Hickey, 34 D. & C. 383, cited in defendant's brief, was reversed on appeal to the Superior Court: Hickey v. Hickey, 138 Pa. Superior Ct. 271. (Allocatur refused, 138 Pa. Superior Ct. 31).

We conclude that the appointment of the guardian of the estate of Mrs. Bergdoll under the Act of 1907 did not render the plaintiff incompetent as a witness against her.

It is not necessary to consider other questions raised in defendant's motion.

## Order

And now, July 31, 1945, defendant's motions for judgment n. o. v. and for a new trial coming on to be heard by the court en banc, after due consideration thereof, the court doth order, adjudge and decree:

1. That defendant's motion for judgment n. o. v. be, and the same is, hereby dismissed.

2. That defendant's motion for a new trial be, and the same is, hereby sustained, and a new trial is awarded.

3. Plaintiff and defendant are each allowed an exception to the action of the court here taken.