CLARA GOODALE, Plaintiff, Appellee, v. GEORGE C. MURRAY, Administrator, et al., Defendants, Appellees, STATE OF IOWA, Defendant, Appellant.

No. 44728.

844

JANUARY 9, 1940.

Geiser & Donahue, for plaintiff, appellee.

William J. Kennedy, County Attorney, for defendants, appellees.

Fred D. Everett, Attorney General, John E. Mulroney and Floyd Philbrick, Assistant Attorneys General, for defendant, appellant.

BLISS, J.—The proceeding was commenced by plaintiff filing her petition in equity to establish and probate the lost will of Henry Dieckman, deceased. George C. Murray, sheriff of Chickasaw county, had been appointed administrator of the estate of the deceased. The deceased had never married, so far as known, and left no known heirs. For that reason Frank Vaala, the tenant on the land, Chickasaw County, the State of Iowa, the unknown heirs of the deceased, and the unknown claimants to the land, consisting of about 170 acres, of which the decedent died seized, were all made defendants in the action. The deceased also left personal property of about the value of $900. Plaintiff alleged that Dieckman died testate, on May 16, 1937, having executed his last will about the year 1920, by the terms of which he had bequeathed and devised all of his property to the plaintiff, but that said will was lost and could not be found, and that he had not revoked said will, nor made a later one. On motion of the defendants, the cause

was transferred to the probate side of the calendar. On motion of the defendants, a part of the prayer of the petition, stating that the defendants had no interest in the estate, and that plaintiff as sole devisee was entitled to all of it, and that title to the real estate be quieted in the plaintiff, and asking general equitable relief, was stricken. Thereafter plaintiff amended the prayer of her petition, by adding: "That said will be ordered filed for probate and notice of probate thereof given and that the same be admitted to probate as the last will and testament of Henry Dieckman, Deceased." All defendants then refiled their answers, which were general denials, on the probate side of the calendar.

Before the introduction of any testimony, Mr. Bookin, attorney for the State of Iowa, made the following objection:

"Comes now the defendant, State of Iowa, and the defendant Goerge C. Murray, as Administrator of the Estate of Henry Dieckman, deceased, by John H. Mitchell, Charles Bookin and Charles Wilson, attorneys for the State of Iowa, and Cronin & Kennedy, attorneys for George C. Murray and Chickasaw County, Iowa, and object to the jurisdiction of this court to proceed at this time in an attempt to establish the contents of the will for the reason that said matter is properly triable to a jury, and contend, and each of them request that the matter of the contents and all other matters germane to the establishment of the lost will be submitted to a jury, instead of to the court."

The objection was overruled and the defendants excepted. The appellant's assignment of error thereon will be hereinafter referred to.

The record discloses, without evidence to the contrary, that Dieckman was a native of Germany, who came to Chickasaw county about 45 years before his death. He was a stonemason by trade. When he first came to the United States and to Chickasaw county, he worked at the farm home of Matt Doyle, the father of the plaintiff. He built foundations for the farm buildings, and helped in making other improvements. Doyle befriended him in various ways. One witness, who knew Dieckman for nearly 40 years, and who had employed him, testified that Dieckman told him that: "The Doyles made a man of

him and got him to invest his money in land and that he appreciated it." Another acquaintance of many years, for whom Dieckman had worked, testified:

"He talked to me about his property and about the Doyles. He told me that the Doyles were his best friends and he called her [Clara Doyle] his little girl, and that she was his best friend. * * * He said the Doyles always helped him when he was in need and he said I could come any day there to get help, and he said Doyle helped him get his property."

Charles Koblassa, a farmer, merchant, butcher and cattle buyer, testified:

"I knew Henry Dieckman about twenty-five years before his death. About six or eight years ago I bought cattle from him and asked him if he had any relatives in the old country. He said yes, I got some brothers in the old country. I said have you any brothers here you can leave your property to. He said it wouldn't do any good because my relation don't get anything out of my property and that he wasn't used right in the old country."

John Wright of Mitchell county, was an acquaintance of 40 years, for whom Dieckman had built a house, barn and hog house, and had done other work from 1900 to 1922. They visited at each other's homes two or three times a year until the death of Dieckman. He testified that about eight or ten years before Dieckman's death, the latter talked to him about the Doyles and his property. "He said Mr. Doyle had started him out in farming and got him to buy some land and when he got through with it he expected it to go back to the Doyles. * * * He didn't tell me which Doyle. I don't think he mentioned that. He said he expected it to go back to the Doyles. He didn't say he had made a will leaving it to Clara Doyle."

Frank Doyle testified:

"I live in Deerfield Township, in Chickasaw County and have lived there for sixty years. I knew Henry Dieckman for a period of forty-five years before he died. He worked on our place for my father, Matt Doyle. He owned land near father's land. My father died in 1923 and I found papers in his safety deposit box which belonged to Henry Dieckman,

848

such as deeds and abstracts for land and some bad notes and receipts. I did not find any will amongst those papers. Those papers came into my possession on the 2nd day of September, 1923, and I later delivered them to County Attorney Kennedy. Dieckman knew the papers were in my possession for after my father died I told him I had the papers and asked him if he wanted them or if he wanted me to take care of them and he told me to take care of them.''

Frank Clark, of Mason City, testified that in 1918 he farmed about a mile and three quarters from Dieckman's place, and at that time he spoke of his property, and that Matt Doyle had got him to buy it, and that he was going to leave his property to Clara Doyle. On cross-examination he said that in 1937 when the plaintiff called him he told her that Dieckman had never said to him that he ''was making a will in her favor.''

The plaintiff testified that she had known Dieckman since about 42 years ago when he first came to work at her father's place. ''I was always good to him because he was a friend of father. I was a small girl then and carried water for him and ran errands for him. We would go there to call on him and visit and pick flowers and grapes and he would go with us and help us and there were never any unpleasant relations between us. I was there at the time of his death. He was very low and I leaned over and asked him if he knew me. I said this was Clara Doyle and he said 'Clara' once or twice. After I told him that, he began to grope around beside him and he handed me a paper wrapped in a cloth. It was a German newspaper, nothing but a German newspaper. I was present when he died on the 15th day of May, 1937, and he handed me this paper about an hour before he died. He was very weak at the time. I am a daughter of Matt Doyle and I knew that some of Mr. Dieckman's papers were in father's box at the time of father's death. I looked through those papers after his death to see whether there was any will and there was no will.''

The husband of the plaintiff testified that he had known Dieckman for about 20 years before his death; that he and his wife had visited him, and on two occasions had taken him

food, and that their relations with him were very friendly. There was no objection to any of the evidence thus far stated.

Karl Kobliska, 36 years old, testified that he had known Dieckman since he was 8 years old; that they were very close friends; that he visited at Dieckman's home on different occasions and fed the stock for him occasionally when Dieckman was engaged in mason work; that he was there on the day of his death; that less than two weeks before his death he was at Dieckman's home and he talked with him about his property and his will. To the question as to what he said on these matters, Mr. Bookin, for the State made this objection:

"Just a minute. We object to the question as an attempt to introduce hearsay evidence of the declarations of the decedent testator, or alleged testator with no proper foundation having been laid; not within the recognized exceptions to the hearsay rule; calling for an opinion and conclusion of the witness, and incompetent, irrelevant to any issue in this case."

The objection was overruled. The witness testified that Dieckman, among other things told him that:

"He had worked for Matt Doyle; he built foundations for his buildings, and then he started to buy this land from Matt Doyle, and he used to borrow money from him, word for word, we never had a note or any mortgage or anything of that kind, and he said there was a date for the interest and he paid Matt for the interest and that if he didn't have the principal he extended it longer, and he said I kept accumulating property by pieces of my land, and I've got a deed to show it, and he said any time I needed help all I had to do was to ask him and it was with a glad heart he helped him."

He testified that Dieckman after talking about his ill health told about a will he had made and that all his property was willed to Clara Doyle. The witness was then asked:

"And state whether or not he told you where that will was made and about when.

"Mr. Bookin: Just a minute. Just a minute.

"A. He said he had made it, it was drawn at the Alta Vista Savings Bank with Otto Bartels and George Scholz also present when they made it.

"Q. Did he say who were witnesses to his will? A. Mr. Bartels and George Scholz.

"Q. And what did he say about who was getting his property when he was gone?

"Mr. Bookin: Objected to as hearsay; not the best evidence; calling for an opinion and conclusion of the witness; incompetent, irrelevant and immaterial."

The objection was overruled, and the witness answered: "He said everything was supposed to go to Clara Doyle."

The motion of the State to strike was overruled.

"Q. Now, when you speak of Clara Doyle do you know now he referred to Mrs. Goodale after she was married, what name he called her, what he said? A. Well he told me that she had married John Goodale and I said I knew that; and he said I always liked that girl and as long as Matt helped him he said he was willing everything I got and had during the time of his life was supposed to go to her."

The appellant's motion to strike, for the reasons previously urged to the testimony was overruled.

"Q. What did he say about being called before his Maker or anything of that kind, at that time two weeks before he died? A. He said I don't feel just exactly right, he said it don't make no difference I am ready to go face Him."

He was close to 84 years old when he died.

Another witness, a woman who had known him for 40 years, and at whose home he had done much work testified, over the objection that the testimony was hearsay, secondary, and without proper foundation, that she had heard Dieckman say that the Doyles had helped him get his property and he wanted it to go back to the Doyles.

Otto A. Bartels, a resident and bank cashier of Mokena, Illinois, testified that from 1910 to 1929 he had been cashier of the Alta Vista Savings Bank, of which George A. Scholz had charge until his death in 1925 or 1926; that he knew Dieckman and saw him in the bank, between 15 and 22 years ago, when Scholz drew a paper for Dieckman.

"Q. Before Scholz drew the paper, what if anything did you hear Dieckman say as to what he wanted?"

"Mr. Bookin: Just a moment. Objected to as incompetent, irrelevant and immaterial to any issue in this case. It is calling for a conclusion and opinion of the witness and hearsay; not the best evidence, and in violation of Section 11257; calling for a conversation with the deceased." The objection was overruled and exception noted.

"A. I heard him say about drawing up a will, and that he had no relatives in this country, and he mentioned the Doyles at that time and particularly he mentioned Clara Doyle to have all of his property after his death."

The witness further testified that after Scholz prepared the will, the witness was called to the back room and he heard Scholz read the will to Dieckman, and that Dieckman signed the will in the presence of him and Scholz, and he and Scholz signed the will as witnesses in the presence of each other and of Dieckman; that Dieckman had requested them to be witnesses to the will; that he did not know what became of the will, as after he signed it he left the room and took care of his business, and that was all he knew about it, and he had never seen the will since that time. The record then shows the following proceedings:

"Q. You may state now, Mr. Bartels, as near as you can the substance of the first paragraph or introductory paragraph of that will as you remember it, that is as nearly as you remember it if you can remember it, and the substance of it if you can remember the will?

"Mr. Bookin: That is objected to as calling for the conclusion of the witness; hearsay; not the best evidence; no foundation laid for the introduction of secondary evidence; the witness is testifying to the declaration of Mr. Scholz as to the contents of the will, and he never read the will but heard it read to him; the witness is incompetent to testify as to the contents of the will until the evidence of some person who actually saw and read the contents of the will is first introduced; no secondary evidence or declarations being admissible or being relevant and material until such time—

"The Court: Well, I think they have shown here there

was a will, purported to be a will, and so far as the search was made it couldn't be found, and I think that is a foundation for secondary evidence. It is overruled. You may answer.

"Objectors except. * * *

"A. Know All Men by These Presents, that I, Henry Dieckman, being of sound memory or mind and memory, and understanding, do make this my last will and testament, revoking all other wills by me made.

"Q. Now, Mr. Bartels, after that will was read to you and Henry Dieckman, did Henry Dieckman say anything about that is the way he wanted it, or that was his will, or that was the way he wanted it, anything of that kind?"

"The same objection previously made was overruled. A. Well that was his will after it was drawn up, so there was no objection to it. After it was read he [Dieckman] signed it, and suggested no changes from the way it was read."

In response to a question, and after the overruling of the objection last stated, the witness testified that the will directed the payment of debts and funeral expenses as soon as practicable. In response to an inquiry as to what further provision, if any, was there in the will regarding the disposition of the testator's property, to which the following objection was made:

"Mr. Bookin: Just a minute. Objected to as calling for the opinion and conclusion of the witness; hearsay; no foundation laid for the introduction of secondary evidence; further objected to because there is a presumption that a will which is not found after the death of the testator has been destroyed animo revocandi by the testator; that any testimony as to the contents of the will prior to overcoming the presumption that the will was destroyed by the decedent is incompetent, irrelevant and immaterial."

The witness answered that after the payment of all debts and funeral expenses, the testator gave, bequeathed and devised to Clara Doyle, all of his property real, personal and mixed, of every kind and nature, wherever located at the time of his death, and that there was no property willed or devised to any other person. He testified that he did not read the will, but that most of the wills prepared in the bank were drawn

on the same form, although he knew the contents of this particular will; that in preparing wills he used the form substantially as used in the Dieckman will, with the first and second clause being usually the same as in that will. On cross-examination he was then asked if he had not signed defendants' Exhibit "1", a statement prepared by the county attorney of Chickasaw county. On receiving an affirmative answer, the following record was made:

"Mr. Bookin: I now want to make an offer to prove, I want to offer to prove that if the witness Otto Bartels was asked the following question his answer would be yes, the question being, to-wit: * * *

"That on June 26, 1938, you made the following written statement:

"At Mokena, Illinois. Have been acquainted with Henry Dieckman for twenty years. Dieckman couldn't be told much —nor could he be advised—he was strongly set in his ways. The making of a will was discussed many times with Mr. Scholz before it was made. Dieckman didn't come to town much in winter time—will probably made in spring. During discussion overheard Dieckman say he had no relations in this country—wouldn't say he had any relation elsewhere. As I remember—about 15 years ago in the old A. V. State Bank, George Scholz typed a will for Henry Dieckman and I, together with Geo. Scholz was a witness to the will. I didn't read the will myself, but in my presence I heard the will read to Dieckman. As I recollect Clara Doyle was mentioned as the principal legatee, but I cannot be absolutely certain of this fact. To my knowledge none of the Doyles had ever discussed this matter with either me or Mr. Scholz. I don't recollect whether Dieckman took the will with him or not, but I do know that he was a person to take care of his own affairs, and I presume he took the will with him. As I recollect Scholz first mentioned the will to Dieckman, as Scholz was a person to strongly urge that people make wills. The second time—the time the will was made—Dieckman brought up the subject. Don't remember who was named Administrator. This statement given to William J. Kennedy at Mokena, Illinois, this

26th day of June, 1938, and read by the undersigned, who received a copy of this statement.

Otto A. Bartels." * * *

"Now, go ahead and make your objection. * * *"

"Mr. Donahue: We have no objection to the instrument being offered in evidence, Your Honor. There is no offer.

"Mr. Bookin: We now offer in evidence Exhibit '1', being the statement of Otto Bartels made on June 26, 1938, at Mokena, Illinois, signed by Otto A. Bartels at that time and by him delivered to William Kennedy."

On redirect examination, without objection he testified as follows:

"George Scholz is dead and I think I am the only living witness to this will. At the time this statement, Exhibit '1', was given, Mr. Kennedy was in a hurry and was only there about ten or fifteen minutes. With regard to the clause in the statement Exhibit '1' 'but I cannot be absolutely certain of the fact' I will state that I do not believe I said this to William Kennedy. At the time I made this statement, I figured I was giving it as before and that I was absolutely sure of that. I did not realize or dream that I made that statement the way it was written because it was done in a hurry as Mr. Kennedy was in a hurry and I did not realize that it was in there. I did not study or read the statement carefully before signing it. At the time Mr. Kennedy was there I had a talk with him and I told him about the contents of the will and that everything went to Clara Doyle but I do not believe I told him I was not certain about that. I mentioned Clara Doyle as the person to whom the property was willed to under the will."

The defendant, George C. Murray, sheriff of Chickasaw county, testified that the day after the funeral he went to the home of the deceased. He had lived alone in an ill-kept, one-room shack, measuring about 12 by 14 feet. The bed was homemade with a straw tick, the pillows filled with flax. The sheriff, with three men, carefully searched the place and everything about it. Papers and receipts were found in different places, some in a can and some in a box. A wallet was found in which there was $109 in currency and some

notes. After a thorough search of 4 or 5 hours, in which no will was found, everything in the shack was taken outside and burned. Inquiry was made at the Elma bank, and it was learned the deceased had no safety-deposit box there. He had such a box at the Alta Vista bank, in which were found two certificates of deposit, some tax receipts, and notes but no will. The cashier of the Alta Vista bank made a search in the bank but found no will. Frank Doyle searched the papers which the deceased had left with Doyle's father, but found no will.

We have set out all of the testimony offered by plaintiff which is pertinent to this appeal. With the exception of Exhibit "1" heretofore mentioned, the defendants offered no testimony, excepting that of a deputy sheriff, and a bank cashier, each of whom stated that the general reputation of Karl Kobliska in the community was bad. The former based his testimony on talks with two or three neighbors, and on his own personal opinion. The cashier based his opinion on talks with the witness, dealings with him, his personal opinion and "somewhat on just common talk."

On November 16, 1938, the judgment of the court was entered of record, finding and adjudging the execution of the will, as stated herein, and that the contents thereof had been clearly established; that it had been lost and could not be found after diligent search; that it had not been destroyed nor revoked by the deceased, and that it was his valid will and in full force and effect; that by its provisions, Clara Goodale, nee Doyle, was the sole devisee, subject to the payment of debts and legal claims, of all of the property of the deceased. The judgment set out in terms the provisions of the will as established, and further provided, as follows:

"It is further Ordered and Adjudged that the findings herein and this order and judgment be filed in the office of the Clerk of the District Court in and for Chickasaw County, Iowa, and the filing thereof shall constitute the filing for probate of the said will as herein found and adjudged and the Clerk of this District Court is hereby ordered to publish notice of the filing for probate of the same and cause notice to be published for three consecutive weeks as provided by statute."

The State of Iowa perfected its appeal on November 23, 1938.

I. The first assignment of error is based upon the refusal of the court to sustain the objection of the State, set out in the forepart of this opinion, made before any testimony was offered, to the jurisdiction of the court to proceed at that time in an attempt to establish the contents of the will, for the reason that this matter and all matters were triable to a jury.

The complete answer to this assignment is the opinion in Coulter v. Peterson, 218 Iowa 512, 514, 255 N. W. 684, 686, relied upon by both appellant and appellee. It was a suit, like the one before us, to establish a will, brought in equity, and transferred to probate. The court there said:

"*The question, however, as to the terms of the lost instrument is for the court in the first instance. If the court should find that the proof is insufficient to establish the terms of the lost instrument, the plaintiffs, of course, must fail. If, on the other hand, the court finds that the lost instrument is properly proven and established, then the next question is whether or not the same should be admitted to probate as the last will and testament of the deceased. When this point is reached the matter stands as do all wills when they are offered for probate, — that is, the same is subject to contest on any of the recognized grounds of law, and if so contested may be tried to a jury. We think this marks out the simplest way of disposition of cases of this character.*" (The italics are ours.)

The trial court, it appears to us, followed this procedure implicitly, and kept strictly within the procedure outlined, both in the trial, and in the provisions of the judgment.

II. It has been the uniform holding of this court, and of courts generally, that to establish a lost will, it is incumbent upon the proponent to prove by clear, satisfactory and convincing testimony, first, the due execution and existence of the instrument; second, that it has been lost, and could not be found, though diligent search was made in all places where there was a reasonable likelihood of its being found, with testimony of the nature of the search, and the places searched; third, that the presumption of its destruction by the testator with the intention to revoke it, arising from its

absence on his death, has been rebutted; and, fourth, the contents or provisions of the will. In re Estate of Thorman, 162 Iowa 237, 144 N. W. 7, Ann. Cas. 1916B, 484; 2 Elliott on Evidence, Sec. 1452; Thompson on Wills, 2d Ed. 1936, Sec. 205; Atkinson on Wills, 1937, Sec. 186, page 482; Schouler on Wills, Executors and Administrators, 6th Ed., Sec. 788; Gardner on Wills, Sec. 99; Page on Wills, 2d Ed., Sec. 796.

Because these essentials are all matters of fact we have felt it necessary to set out the pertinent testimony as fully as we have. The objection to testimony offered by the appellee, upon which the appellant relies, is that it is hearsay, and is not within any exception to the hearsay rule.

What testimony is there in support of the first essential? One of the well established exceptions to the hearsay rule is the admission of statements of the declarant showing his existing state of mind respecting design, intent, motive, feeling etc. Wigmore in his work on Evidence, 2d Ed., Sec. 1725, states:

"It has already been seen (ante, §102) that the existence of a design or plan to do a specific act is relevant to show that the act was probably done as planned. The design or plan, being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct (ante, §§253, 300). But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception *by the person's own statement as to its existence.* (Italics supplied.) The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this Exception (ante, §1714), namely, the statements must be of a *present existing state of mind,* and must appear to have been made in a natural manner and not under circumstances of suspicion. * * * The use of such statements of design or plan is illustrated in a variety of precedents. The typical situation, it must be noted, involves (1) the doing of an act which is in some way part of the issue or relevant thereto, (2) the existence of a design or plan to do this act, as evidence (ante, §102) of the probable doing of the act, and (3) the hearsay use, under the present Exception of the person's statements of this design or plan."

The principle was thus stated by Chief Justice Field in

Commonwealth v. Trefethen, 157 Mass. 180, 186, 31 N. E. 961, 963, 24 L. R. A. 235:

"The fundamental proposition is that an intention in the mind of a person can only be shown by some external manifestation, which must be some look or appearance of the face or the body, or some act or speech; and that proof of either or all of these for the sole purpose of showing state of mind or intention of the person is proof of a fact from which the state of mind or intention may be inferred. * * * Although evidence of the conscious voluntary declarations of a person as indications of his state of mind has in it some elements of hearsay, yet it closely resembles evidence of the natural expression of feeling which has always been regarded in law, not as hearsay, but as original evidence; and when the person making the declarations is dead, such evidence is often not only the best, but the only, evidence of what was in his mind at the time. * * * It is not necessary in the present case to determine what limitations in practice, if any, must be put upon the admission of this kind of evidence, because all the limitations exist which have ever been suggested as necessary. The person making the declaration, if one was made, is dead; * * * and the declaration, if made, was made under circumstances which exclude any suspicion of an intention to make evidence to be used at the trial."

In the case before us every element essential to this exception to the hearsay rule is present. The relevant fact issue is the execution of the will. The declarant is dead, and the evidence of his declarations is the best and only evidence of what was in his mind. They were made as a part of the transaction itself, and at a time and under circumstances affording no inducement for misrepresentation. Had he made a statement before leaving his farm that he was going to town to make a will, no one would question the competency or relevancy of such declarations as tending to show that he did make a will on reaching town. A fortiori, his statements to Scholz, as testified to by the subscribing witness, Bartels, on later reaching the bank, that he wished to make a will, and further wished to will his property to Clara (Doyle) Goodale, are not only evidence of his state of mind, his testamentary intention and plan, but they are competent and relevant evi-

dence tending to show that he put his plan into effect by executing such a will.

There can be no question of the admissibility of his declarations for these purposes. Where a state of mind, intention or plan is in issue, or is relevant to an issue, the manifestations thereof by conduct or speech are always admissible. Wigmore on Evidence, Sections 1714, 1731. Where one is charged with a crime, evidence of his conduct or statements showing a frame of mind or plan on his part to commit such a crime would, of course, be admissible in support of the charge.

In re Will of Brown, 143 Iowa 649, 120 N. W. 667, evidence of declarations of the testator, at the time of executing an alleged will, was admitted without objection, but was held competent by the court. The situation was somewhat different from the one before us. There the subscribing witnesses were not present when the will was drawn, but the testator, with the will prepared, took it to the witnesses and stated to them that it was his will, and asked them to witness his execution of it, and to sign as such witnesses. The court held that the testator's statement that the instrument was his will, was not competent evidence of that fact, since it was his conclusion on a mixed question of law and fact. But there was no holding by the court that evidence of this declaration was obnoxious to the hearsay rule of exclusion. In holding otherwise, the court, speaking through Chief Justice Evans, on pages 660 and 661 of the Iowa report, 120 N. W. page 669, said:

"It is argued that the contestants were entitled to prove that Brown said the instrument which he was then executing was his will. This contention may readily be conceded. * * * We have already indicated our view that the declarations of the testator at the time of the alleged will of 1906 were admissible. If admissible, they were proper to be considered for some purposes. They were admissible *as attendant upon the act of execution of the will. They were proper evidence of the mental condition of the testator and of his intention and understanding of the nature of the instrument which he was executing.* [Italics supplied.] They were not evidence of the contents of the will. In re Will of Dunahugh, supra [130 Iowa 692, 107 N. W. 925].'

With respect to the last quoted sentence, it may be said that there was no attempt in the case to prove the contents of the will by declarations of the testator. The same is true of the Dunahugh case cited in support of the statement.

■ What further evidence is there of the execution of this will? There is the direct testimony of Bartels that after the will was prepared by Scholz, at the request of and upon the direction of Dieckman, it was read aloud to him and to Bartels, and without objection to its form or contents as read, and without any suggestion of change in the instrument, Dieckman signed the will in the presence of Scholz and Bartels, and they each signed as witnesses to the execution in his presence. None of the testimony of Bartels respecting the execution of the will was hearsay. He testified to no declaration of Dieckman in the execution. He gave only direct and original testimony as to the wordless conduct of Dieckman. Conduct which was not performed by him with the intention of conveying any message, or expressing a fact. What Bartels testified to as taking place is convincing circumstantial evidence that Dieckman executed the instrument in the belief that it was a testamentary disposition of his property in accordance with his intentions.

■ There is further competent evidence of the execution of the will, and it also comes within the hearsay exception, permitting declarations of a deceased person, not as showing the truth of the fact declared, but as proving the then state of mind, and belief of the declarant, as tending to prove his prior act. The witness, Kobliska, was asked whether on an occasion, about two weeks prior to Dieckman's death, the latter had told him where and when his will was made. Mr. Bookin, for the appellant said: ''Just a minute. Just a minute,'' and then evidently decided to make no objection. Had he made an objection that the question called for secondary and hearsay testimony, it would have been of no validity, for the reasons just stated. But he made no objection. The witness answered that the will was drawn and he had made it at the Alta Vista Savings bank with Scholz and Bartels as witnesses to its execution. It needs no citation of authority in support of the proposition that a failure to object or otherwise raise the question as to the admissibility of evidence in

the trial court is a waiver of all objections thereto, and the testimony is in the record for consideration the same as all other testimony. 1 Elliott, Evidence, Sec. 330. "An objection serves, for the rules of evidence, the same purpose as a demurrer for the rules of substantive law." Wigmore on Evidence, Sec. 18. Hearsay testimony may be both relevant and material, and where admitted without objection, may be considered and given its natural probative effect. 20 American Jurisprudence, Section 452, and cases cited.

Further evidence of the execution of the will was introduced by the appellant itself, in the introduction of its Exhibit "1", the written statement procured by it from Bartels, in June prior to the trial. A party who objects to the introduction of testimony on direct examination, of course, does not waive that objection and exception, by cross-examination of the witness with respect to this testimony. Neither does the objector waive his objection and exception by himself introducing testimony, defensive to the testimony objected to, and weakening it, or impeaching the witness. Such testimony was the statement in the exhibit: "As I recollect Clara Doyle was mentioned as the principal legatee, but I cannot be absolutely certain of this fact." (He denied this on redirect examination.) This was proper and could have been introduced by itself, but the appellant was not content to do this, but went further and introduced the entire exhibit, which contains the following statement:

"As I remember — about 15 years ago in the old A. V. State Bank, George Scholz typed a will for Henry Dieckman, and I, together with George Scholz was a witness to the will. I didn't read the will myself, but in my presence I heard the will read to Dieckman."

This testimony was not a mere repetition of testimony given on direct examination, but was independent testimony introduced by appellant. It was not defensive to or contradictory of testimony objected to on direct examination, but it supported it and was confirmatory thereof. Whatever exceptions the appellant saved to such testimony as is embodied in the last quotation from the exhibit, were waived by its introduction by appellant. Abbott, Civil Jury Trials, 3d Ed. pages 322, 323; Jameson v. Tully, 178 Cal. 380, 173 P. 577; Metropoli-

tan Nat. Bank v. Com. Bank, 104 Iowa 682, 693, 74 N. W. 26; N. Y. Life Ins. Co. v. Taliaferro, 95 Va. 522, 28 S. E. 879.

Coming now to the second essential, e.g., the proof of the loss of the will and the search therefor, we think the record herein set out clearly shows that the will could not be found, although a thorough search was made not only in the humble and primitive home of the deceased, but in banks, among the Doyle papers, and in the various places where it was at all likely that he would have kept it. From the careless manner in which he kept his papers, it is not strange that it could have been misplaced or destroyed. Another circumstance of slight, if, perhaps of any probative value, is the fact that in his last dying hours, he apparently had in mind that he had some paper or document which he wished to give to the appellee, as he fumbled about his straw bed tick and handed her a paper wrapped in a cloth. It proved to be but a German newspaper. It is unlikely that this could have been what he wished to give this Irish woman.

The evidence adduced to prove the loss of the will, and that it could not be found, and the nature and facts of the search, is sufficient to comply with the requirements of proof announced by the authorities in cases of this kind. 2 Elliott on Evidence, Sections 1456, 1459; Laird v. Kilbourne, 70 Iowa 83, 30 N. W. 9; Hansen v. American Ins. Co., 57 Iowa 741, 11 N. W. 670; Meginnes v. McChesney, 179 Iowa 563, 581, 160 N.W. 50, L. R. A. 1917E, 1060; Atkinson on Wills, page 456; Thompson on Wills, Sec. 205; Fisher & Ball v. Carter, 178 Iowa 636, 641, 160 N. W. 15. Whether this proof is sufficient is ordinarily addressed to the sound discretion of the trial judge, and since he sees the witnesses and is in close touch with the facts, his conclusion on this question will not be disturbed unless abused. 2 Elliott on Evidence, Sec. 1456; Page on Wills, 2d Ed., page 1349, and Sec. 773.

With respect to the third essential in the establishment of a lost will, it may be said that the rule is practically unquestioned that in the absence of any evidence, as to circumstances of destruction, a presumption arises that a will which was in the custody of a testator, and which cannot be found at his death, was destroyed by him with the intention of revoking it. However, the presumption is a rebuttable one, and may be

strengthened or overcome by proof of declarations of the testator, either for or against it, or by proof of the circumstances of the testator, or of his relations to the persons involved. Thomas v. Thomas, 129 Iowa 159, 105 N. W. 403; Atkinson on Wills, pages 456, 482; 1 Schouler on Wills, Sections 660, 661; Chamberlayne on Evidence, Section 1078 et seq.; brief in 79 A. L. R. 1498; Steinke's Will, 95 Wis. 121, 70 N. W. 61; Gardner on Wills, Sec. 99; Page on Wills, 2d Ed., Sec. 798; brief in 50 L. R.A., N. S., page 861 et seq.; Jones on Evidence, Sec. 485; Thompson on Wills, Sec. 206; 1 Jarman on Wills, 7th Ed. 1930, 140, 141; In re Johnson's Will, 40 Conn. 587; In re Estate of Thorman, 162 Iowa 237, 144 N. W. 7, Ann. Cas. 1916B, 484.

There is nothing in the record to strengthen the legal presumption with which the appellant is favored. There is much to weaken and to overcome the presumption of revocation. The life which the testator lived and all of his surroundings and relationships rebut the presumption. He had no relatives, by blood or marriage, in this country, so far as known. He had apparently severed all relations with his relatives, if any, in Germany. He had stated that they would get none of his property. It is undisputed that his best friend and helper was Matt Doyle, the father of the plaintiff. Doyle had befriended and advised him, and had assisted him financially and otherwise in the acquisition of his property. From a time, perhaps antedating the execution of the will to his last days, he had repeatedly expressed his friendship for and his gratitude to the Doyle family. He had known the plaintiff since she was a child and she had endeared herself to him. To old friends and acquaintances at different times through the years he had stated that the Doyle family had made it possible for him to acquire his property, and that he intended it should go back to them. To others he stated that the property would go to Clara Doyle, the plaintiff. Kobliska testified that two weeks before the old gentleman's death he expressed to Kobliska his friendship for the Doyles, and that he had made the will in question giving all of his property to the appellee. Such conduct on his part, his relationships and attachments, his declarations as to the existence of the will, or his belief in its existence, are all clearly inconsistent with and repugnant to an intention on his part, to die intestate, or to have revoked

his will. It is our judgment that any presumption of revocation was clearly rebutted with evidence of the weight and kind required by our decisions.

The matter which has given us the most concern is the proof of the fourth essential element of the appellee's case, the contents of the will. There is much diversity of opinion in the decisions of the courts respecting the declarations of a testator to establish the provisions of his lost will. Some hold that the declarations, in themselves, are sufficient, and others, that they are not, in themselves, sufficient, but are admissible only in corroboration of other direct evidence of the contents of the will. Other decisions make the admissibility depend upon the time when the declarations were made, making a distinction according to whether the declarations were before, at the time of, or after, the execution of the will. Many decisions hold the declarations are admissible if a part of the "res gestae"—a term whose meaning is somewhat elastic and indefinite. Other courts hold that the time of the declaration goes only to the weight of the testimony. Discussion of this question may be found in Schouler on Wills, Section 661; Page on Wills, Section 796; 1 Jarman on Wills, 7th Ed. 1930; Thompson on Wills, 2d Ed. 1936, Section 206; Wigmore on Evidence, Section 1735, 1736.

There has been no case decided by this court in which it has been sought to establish the contents of a lost will by evidence of the declarations of the testator although there are obiter statements in one or two cases that the contents cannot be so proved. In re Estate of Thorman, 162 Iowa 237, 144 N. W. 7, 8, Ann. Cas. 1916B, 484, it is said: "Something more than the declarations of the testator is essential to accomplish this." In that case, however, proof of the contents was sought to be proved solely on the direct testimony of the scrivener.

In the case before us the post-testamentary statements of the testator are relied upon only to rebut the presumption of revocation, and not to prove the contents of the will, and we do not pass upon their admissibility or competency for the latter purpose.

To establish the contents of the will we have considered only the declarations and conduct of the testator on the occa-

sion of the execution of the will, and any relevant prior declarations, and the testimony of Bartels.

The specific question which we must answer respecting Bartels' testimony is this: May a witness, in this case a subscribing witness, who hears the testator instruct the scrivener, who is to draw his will, as to the disposition he wishes to make of his property, and who hears the scrivener, after typing the will, read it aloud to the testator, and sees the testator sign the will without any suggestion of change therein, and in apparent acquiescence, and hears him request the scrivener and the witness to sign as witnesses, which they do, testify as to the contents of that will, notwithstanding he never read the will and has no other knowledge of its contents, in a proceeding to establish the will, which has been lost and could not be found after proper search, and there is no copy of the will or other memorandum, and the scrivener is dead, and there is no other evidence of the contents of the will? If we answer in the affirmative it is because the testimony is not obnoxious to the hearsay rule. The reasons for the exceptions to the hearsay rule are stated by Wigmore in his work on Evidence, Section 1420 et seq.

The situation at the time of the execution of Dieckman's will meets every requirement justifying an exception to the rule. Dieckman and Scholz are dead and, of course, not available for cross-examination. The only source of testimony was the witness Bartels. Unless his testimony be accepted there is none available. The essential of necessity is fully met. The same is true of the circumstantial guarantee of trustworthiness. What good reason can there be to suspect the sincerity or the truth or reliability of what either the testator or Scholz did or said on that occasion? Scholz was his banker and business adviser. They had previously discussed the making of the will. Scholz, knowing the circumstances of this elderly bachelor, had advised him to make a will, and had no doubt stressed the reasons why it was particularly advisable in his case. Having concluded to make a will, he naturally frankly and honestly told Scholz of his testamentary wishes, and asked him to draw the will. Is there any reason why Scholz would not prepare the instrument exactly as Dieckman wished it, or that he would have read it to him falsely

or incorrectly? He would have been both a knave and a fool to have done otherwise, and would have exposed himself to early and certain detection. Had Scholz read the will other than Dieckman had instructed him to draw it, Dieckman would have detected it when it was read, and had he violated his instructions in drawing the will, he would have been exposed as soon as Dieckman later at his leisure read it. The situation itself was a guaranty of the verity of the declarations testified to by Bartels. Three defects of hearsay testimony often mentioned by courts and commentators are: 1. Inaccurate perception on the part of the declarant. 2. Faulty memory on his part. 3. Untruthfulness on his part. In this case there was no basis or occasion for either inaccurate perception or faulty memory, for neither memory nor perception were called into action. Scholz merely read what he had just written. And as already stated there was no reason for untruthfulness. It is our judgment that the testimony met every essential requisite justifying its admission as an exception to the hearsay rule.

The adjudications which are closely in point upon the admissibility of Bartels' testimony of the contents of the will as acquired from hearing Scholz read the will, are not many, but there are some which bear directly upon the question and sustain its admission. Such cases include the following: Morris v. Swaney, 1871, 54 Tenn. 591, 7 Heisk 591; Everitt v. Everitt, N. Y., 41 Barb. 385; Nelson v. Whitfield, 1880, 82 N. C. 46; Asbury v. Hannum, 1917, 8 Tenn. Civ. App. 146. The cases of Edwards v. Noyes, 65 N. Y. 125, 126, and Laster v. Blackwell, 128 Ala. 143, 30 So. 663, Id., 133 Ala. 337, 32 So. 166, support our view as to the admissibility of the evidence in question, but these cases present a different question on the sufficiency of the evidence. See also Breen v. Richardson, 6 Colo. 605; Huls v. Kimball, 52 Ill. 391.

Among the decisions opposing our conclusion, perhaps the leading cases are Chisolm's Heirs v. Ben, Ky., 1847, 7 B. Mon. 408 and Colligan v. McKernan, N. Y., 1884, 2 Dem. 421. We prefer the cases which hold contrary to these two decisions.

Cooley v. Cooley, 116 Misc. 157, 189 N. Y. S. 577; Cantway v. Cantway, 315 Ill. 244, 146 N. E. 148; Clark v. Turner, 50 Neb. 290, 69 N. W. 843, 38 L. R. A. 433, cited by appellant,

and In re Guinasso's Estate, 13 Cal. App. 518, 110 P. 335, were will cases but the declarations were post-testamentary, and were under circumstances far different from those before us, and where the circumstantial guarantee of trustworthiness might reasonably be questioned.

Propst v. Mathis, 1894, 115 N. C. 526, 20 S. E. 710, 711, was an attempt to prove the probate and contents of a lost will. The only testimony was that of the plaintiff, who testified that in 1853 the clerk of court, on his request to see the will in question, "and from a large book in his office, read it to me and said it was the will." In reversing the court said:

"No witness, so far as this record shows, was produced who could say, upon oath and subject to cross-examination, that the will of Adam Overwenters was ever recorded in Burke County. Indeed, so far as appears, no witness was called who testified that any such will ever existed. We do not think that the plaintiff should have been permitted to prove the existence of this will, its probate, and its contents by the mere statements of the clerk."

The court also further distinguished the case from Nelson v. Whitfield, 82 N. C. 46, which we have cited herein in support of our holding. It will be noted that the statement was a post-testamentary one.

Lacy et al. v. Meador, 170 Ala. 482, 54 So. 161, 163, Ann. Cas. 1912D, 787, discusses some cases on both sides of this question, among them the two Laster cases, decided by that court, and referred to herein. They are not overruled. In the Lacy case it was sought to prove the contents of a lost letter, by an employee who claimed to have heard it read. In upholding its exclusion the court said:

"Just how otherwise or when or by whom it was read did not appear. * * * If it had been shown that the witness heard Lacy dictate the letter, or that he heard it read to Lacy for approval at the time of the writing, doubtless these circumstances would be accepted as a sufficient guaranty of trustworthiness. But that is not the case."

It will be noted that the quotation refers to just what was done in the case before us.

Other cases where knowledge of the contents of writings

of various kinds obtained only from hearing them read, has been questioned or refused, are Nichols v. Kingdom Iron Ore Co., 56 N. W. 618; Coxe v. England, 65 Pa. 212; Mutual Life Co. v. Tillman, 84 Tex. 31, 19 S. W. 294; Russell v. Brosseau, 65 Cal. 605, 4 P. 643; Appeal of Richards, 122 Pa. 547, 15 A. 903; Hooper v. Chism, 13 Ark. 496; Edisto Phosphate Co. v. Standford, 112 Ala. 493, 20 So. 613 and McIntyre v. White, 124 Ala. 177, 26 So. 937. The extreme length of this opinion forbids any analysis of these decisions, but none of them is applicable as authority in this case, because of entirely different fact situations, and each may be readily distinguished from this case. We have found no case involving this question, whether for or against, in which the facts so justify the admission of this testimony, as an exception to the hearsay rule, as the one before us for review.

Before leaving this subject we wish to refer to the case of McCarn v. Rundall, 111 Iowa 406, 82 N. W. 924, an action in equity to probate a destroyed will. It is relied upon by appellant, but does not support its contention. The opinion does not mention hearsay and no such objection or question was raised in the case. The decision was rightly reversed for a number of other reasons. In the first place there was but one subscribing witness. The testimony was not held to be incompetent or inadmissible, but was held to be insufficient because indefinite. The witness referred to in the will was the executor named in it, and was present when it was prepared. There is nothing in the record to show in what manner he obtained knowledge of its contents. He was never asked. The attorney who questioned him drew the will and had a purported copy of it in his hand during the examination. This copy was never identified by the reporter, or offered in evidence, or made a part of the record.

 III. The only question remaining is whether the evidence was of that clear, satisfactory, and convincing character required by our decisions. McCarn v. Rundall, supra; Re Will of Dunahugh, 130 Iowa 692, 107 N. W. 925; In re Estate of Thorman, 162 Iowa 237, 144 N. W. 7, Ann. Cas. 1916B, 484; In re Will of Brown, 143 Iowa 649, 120 N. W. 667; Miller v. Miller, 203 Iowa 888, 210 N. W. 537; In re Estate of John Delaney, 207 Iowa 448, 223 N. W. 484; In re Will of Rutledge,

210 Iowa 1256, 232 N. W. 674. In Thomas v. Thomas, 129 Iowa 159, 160, 105 N. W. 403, the court said that the presumption of revocation in the case of a lost will must be overcome "by evidence strong, positive, *and free from doubt.*" (Italics supplied.) The italicized words have never been repeated in any later decision of this court. The writer does not recall of any such requirement in any decision. In a criminal case the proof must convince beyond a *reasonable* doubt. As stated by Wigmore, "beyond a reasonable doubt or the like, is apparently greater than that ordinarily demanded." Evidence, Sec. 2106. In his work on Wills, Arkinson says: "While the evidence must be full and satisfactory, it need not be such as to remove all reasonable doubt." Sec. 186, page .455, Skeggs v. Horton, 82 Ala. 352, 2 So. 110.

The words "free from doubt" impose a still heavier burden and one that is unwarranted, and to that extent Thomas v. Thomas, supra, is overruled. While it is highly proper that one who seeks to establish as a valid will, one that is lost or destroyed and unrevoked, should be required to produce evidence that is clear, convincing and satisfactory, yet the burden put upon him should not be prohibitive. Wills are carelessly lost and misplaced and a reasonable opportunity should be given to establish such a will. Likewise wills are sometimes suppressed or destroyed for an ulterior purpose. The defeat of that purpose ought not be made too difficult or impossible. As stated by Page in his treatise on Wills:

"The statutes upon the subject of lost wills are generally framed upon the theory that, within limits of safety, the spoliator of a will should be prevented from gaining anything by his wrongful act." Sec. 799, 2d Ed.

This action was tried in probate as one at law. There is ample evidence to support the findings of the trial court. There is no improbability in the record made by the appellee. The witness Bartels was intelligent, his recollection was clear and definite, and there appears no reason to question his honesty. The terms of the will were the simplest. The trial court was in much better situation to pass upon the weight and credibility of the witnesses than are we. It is our judgment that the evidence was of the character and weight which we have held

to be necessary in such a proceeding. The judgment is therefore affirmed.—Affirmed.

HAMILTON, C. J., and SAGER, STIGER, MILLER, HALE, MITCHELL, and OLIVER, JJ., concur.