**IN THE COURT OF APPEALS OF IOWA**

No. 17-0467
Filed August 15, 2018

**IN THE MATTER OF THE ESTATE OF DONALD G. SPECK, Deceased.**

**LISA M. SPECK, MATTHEW D. SPECK, TODD M. SPECK, JEREMY J. SPECK, and NICHOLAS A. SPECK,**
　　　Intervenors-Appellants,

**vs.**

**MARK D. FARGO,**
　　　Petitioner-Appellee.

_____

　　　Appeal from the Iowa District Court for Warren County, Patrick W. Greenwood, Judge.

　　　Testator's children appeal a district court order granting a petition to probate a lost will. **AFFIRMED.**

　　　Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, PC, West Des Moines, for appellants.

　　　Matthew D. Gardner of Gardner Law Firm, PC, Urbandale, and John D. Hartung of Hartung & Schroeder, Des Moines, for appellee.

　　　Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

The children of Donald Speck (Don) appeal a district court order granting a petition to probate a lost will filed by Donald's ex-son-in-law, Mark Fargo, under which Mark was a beneficiary and co-executor and the majority of Donald's children were disinherited. The children argue the presumption of revocation was not rebutted by clear, satisfactory, and convincing evidence. They also assert the court erroneously shifted the burden of proof to them.

## I.     Background Facts and Proceedings

Don and his ex-wife, Margo, had five children: Matthew, Todd, Jeremy, Nicholas, and Lisa. The negative nature of the dissolution of Don and Margo's marriage, Don's perception that the children favored Margo, and Margo's remarriage to Don's friend led to varying degrees of hostility and alienation between Don and his children for many years.

Don executed a will on August 15, 2012 with the assistance of his long-time attorney Robert Thomson. The will left fifty percent of the residue of Don's estate to his son, Jeremy, and fifty percent to his then son-in-law, Mark, and named both as co-executors of the estate. The will also expressly disinherited Don's other four children. Thomson retained a copy of the will, gave the original to Don, and advised him to keep it in a safe place. Don was known to use a filing cabinet in his house to keep important documents. On the same day, Don also executed a durable general power of attorney and a power of attorney for healthcare decisions, naming Mark and Jeremy as attorneys-in-fact. Soon after, Don met with Mark and Jeremy to reveal he had written a will and put both of them in charge of it. He told them the will would anger the rest of the family but did not produce a

copy or explain the specifics of the will. Don also asked Mark and Jeremy to not reveal this conversation to anyone, including their spouses.

At the time the will was executed, Mark was married to Don's daughter, Lisa, and had known Don and the family since childhood. In September 2014, Mark petitioned for a dissolution of their marriage.[1] During the time of the dissolution proceedings, Mark continued to talk with Don and met him at a car show. Mark had keys to and stored a car in Don's garage. Don and Mark also worked on a sewer project at Don's home until Don's stroke.

On December 3, 2015, Don suffered a catastrophic stroke. He was hospitalized and ultimately died on December 16. Don's son Matthew moved into Don's home during his hospitalization and remained there after his death based upon the recommendation that someone be present at the house in order to protect the house and other assets and handle any issues with Don's tenant.

On December 28, Don's son Jeremy met with Thomson alone to discuss the estate and its assets as well as the process going forward. Thomson showed Jeremy a copy of the will in his possession and informed Jeremy to look for the original of that copy. On December 31, Thomson met with Don's children and Mark to review the terms of the will. Before this meeting, Jeremy met with his siblings and informed them that the contents of the will could frustrate them, but he did not explain the specifics of his siblings' disinheritance. At the December 31 meeting, after discovering that Mark was to receive fifty percent of the estate, two of Don's children asked Mark to decline and waive his rights under the will. Mark

---

[1] Their marriage was dissolved in September 2015.

refused. When Thomson asked Jeremy if he had found the original will yet, Jeremy answered he had not looked for it yet.

Jeremy and Matthew subsequently conducted a search of Don's home. Lisa was present during the search. All three testified they did not find Don's original will. However, they found a life insurance policy worth fifty-thousand dollars which named Matthew the sole beneficiary.

On January 7, 2016, Mark petitioned the court to probate a lost original will and asked the court to admit the copy to probate to allow its administration. Don's children objected. During a three-day bench trial, the court heard testimony from all of Don's children, Thomson, Don's sister, Don's friend, Mark, and Mark's brother. The court granted Mark's petition to probate the will. Jeremy, who would share in Don's estate under the will or intestacy, and his siblings, who would share in Don's estate under intestacy, appeal.

## II.    Standard of Review

The action was triable in probate as one at law without a jury, so our review is only upon the errors assigned. *In re Estate of Crozier*, 232 N.W.2d 554, 556 (Iowa 1975). "The trial court's decision on the facts has the force and effect of a jury verdict." *Id.* at 558. "The credibility of witnesses and weight of evidence is for the trial court." *Id.* If there is doubt or ambiguity, we construe the findings "to uphold, rather than defeat, the judgment." *Grinnell Mut. Reins. Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). The question we face "is not whether the evidence might support a different finding, but whether the evidence supports the findings actually made." *Second Injury Fund of Iowa v. Braden*, 459 N.W.2d 467, 468 (Iowa 1990). If substantial evidence supports the trial court's findings of fact, such

findings are binding upon this court. *In re Estate of Hoxsey*, 225 N.W.2d 141, 142 (Iowa 1975). However, this principle is "true only if in reaching the fact findings the court applied the proper rules of law." *Crozier*, 232 N.W.2d at 558.

**III.    Analysis**

"In the absence of any evidence, as to circumstances of destruction, a presumption arises that a will which was in the custody of a testator, and which cannot be found at his death, was destroyed by him with the intention of revoking it." *Goodale v. Murray*, 289 N.W. 450, 459 (Iowa 1940). However, this presumption is not conclusive and is rebuttable. *Id.* The presumption of revocation is an "inference of fact drawn from the inability to locate a will which was last known to have been in the possession of the testator . . . and it is a fact question as to whether the presumption, or inference, has been overcome." *In re Estate of Givens*, 119 N.W.2d 191, 194 (Iowa 1963).

To establish the existence of a lost will, it is incumbent upon the proponent to prove by clear, satisfactory, and convincing evidence:

> (1) due execution and former existence of the alleged will (2) that it has been lost and could not be found after diligent search (3) that the presumption of destruction by decedent with intent to revoke it, arising from its absence at death, has been rebutted, and (4) contents of the will. The evidence need not be free from doubt.

*Crozier*, 232 N.W.2d at 556.

The trial court found Mark proved all elements of a lost will by clear and convincing evidence. This conclusion is binding on us if supported by substantial evidence. On appeal, the children do not contest the establishment of elements one, two, and four. They challenge whether the third element has been established by clear and convincing evidence, arguing Mark failed to present

sufficient evidence to rebut the presumption Don destroyed his will with the intent to revoke it. They contend Don's relationship with Mark had deteriorated to the point that Don wanted to remove Mark from the will, due to his divorce from Lisa along with some of Mark's business decisions. They also argue the district court erroneously shifted the burden of proof from Mark to the children and concluded they failed to prove Don had revoked his will.

The district court found the following acts and declarations of Don were sufficient to rebut the presumption: (1) the will still existed on or about Thanksgiving of 2015; (2) there was no direct evidence that Don had destroyed his will or declared his intention to revoke it; (3) while Don may have wished to revise his will, there was insufficient evidence of what those contemplated changes would be; (4) though Don's relationship with his children likely improved from the time of the execution of the will to the day of his stroke, the court was not convinced Don's relationship with Mark had inversely deteriorated; and (5) after Don's death, Jeremy, Matthew, and Lisa had access to Don's house and his filing cabinet in which he had previously stored important documents. The court held "on balance the facts available to the Court are inconsistent with a conclusion that Don intended to die intestate."

The presumption of revocation "may be strengthened or overcome by proof of declarations of the testator, either for or against it, or by proof of the circumstances of the testator, or of his relations to the persons involved." *Goodale*, 289 N.W. at 459. First, the court determined the will was still in existence around Thanksgiving of 2015 based on comments Don made to his sister at that time about wanting to make changes to his will. Jeremy also testified to comments Don

made about his will in late October 2015 which suggest the will was still in existence at that time. Additionally, the court found there was no evidence that Don actually destroyed his will at any point before Thanksgiving of 2015 or before his stroke on December 3. This conclusion was influenced by evidence Don had destroyed a previous will in 2005 and had notified his attorney when he did so. No witness testified that Don had expressed any desire to revoke or destroy the 2012 will or informed anyone that he had actually done so. The court did recognize that because Don's stroke was unexpected, he would have had no sense of urgency to contact his attorney or replace his will.

There was also testimony that Don expressed a desire to modify his will but Don never communicated the exact modifications to anyone. Jeremy repeatedly testified that his father had stated that he "needed to get him off of there" and equated this statement to removing Mark from the will. However, Jeremy also admitted the statement meant nothing to him. The testimony that Don expressed wanting to take Mark "off there" is vague and ambiguous as to what "there" meant. As Mark was a co-executor of the will, a beneficiary under the will, and a co-power of attorney for both health care and financial affairs, any of these could have been "there."

Additionally, Don's sister testified that Don "[had] some changes [he] need[ed] to make after everything that has happened." The children argue that Don's statements indicated he wanted to remove Mark from the will, citing the improved relationship between Don and some of his disinherited children and the deteriorating relationship between Don and Mark. In its ruling, the trial court did not discount the improved relationship between Don and some of his children. On

examination of the evidence, it is certainly possible that Don intended to change his will to include some of those children as beneficiaries. However, as the district court found, the evidence before the court did not show that the possibility of adding some of his children as beneficiaries necessarily meant Don wanted to or was going to remove Mark as an executor or beneficiary. Mark presented testimony that he still had a relationship with Don, including that Don gave him keys and allowed him to store a car in his workshop, as well as the fact that they continued to consult and work together on a sewer project. Further, Don's attorney, Thomson, was also aware of the strained relationship between Don and some of his children. Thomson testified that Don was trying to determine if he should change the provisions of his will relating to his children. But Don never told Thomson of any specific changes he was considering. Don also never told Thomson that he had revoked his will or was contemplating revoking the will, nor did Don communicate that he was thinking about removing Mark from the will as an executor or beneficiary or from his powers of attorney.

Finally, the court, though not concluding one or more of Don's children destroyed his will, took into consideration the fact that Jeremy, Matthew, and Lisa had access to Don's house and filing cabinet—in which Don was known to keep important documents—after Don's stroke and subsequent death.[2] "Proof a person who has an adverse interest had access to the testator's will either before or after the testator's death may carry weight in the determination as to whether the will was revoked by the testator." *In re Estate of Wiarda*, 508 N.W.2d 740, 743 (Iowa

---

[2] The court's ruling included its observations concerning Lisa's demeanor as a witness but did not expressly or implicitly tie those facts to any credibility determination.

Ct. App. 1993). The children do not deny that Jeremy, Matthew, and Lisa all had access but argue the court placed too much weight on this point and erroneously placed the burden of proof on them. Matthew and Lisa only share in the estate under intestacy and so they have an interest that is adverse to the terms of the will—a lost will presumed revoked benefits them. They argue, however, that Jeremy, who would receive fifty percent under the will and only twenty percent under intestacy, would benefit by finding the will. The court reasoned that although Jeremy would take less if the will were revoked, his feelings of guilt over being the only child named in Don's will and the effect that could have on the family going forward would be assuaged by his joining forces with his siblings. The court's consideration of access by some of Don's disinherited children is a proper consideration as "the mere fact that the contestant had an opportunity to destroy the will would not of itself overcome the presumption that it was destroyed by the testator with the intent to revoke it; still it is a circumstance to be considered with other proof." *Id.* at 744 (citations omitted). The court here did not base its entire decision on the opportunities some of the children had but was mindful of those opportunities in context with all of the evidence before it while making its decision.

Throughout its ruling, the court repeatedly identified the burden was on Mark to rebut the presumption of revocation, and we do not find the trial court misapplied this burden in its conclusion. In isolation, each of the reasons for the court's conclusion would be insufficient to rebut the presumption of revocation. However, the court's ruling does not identify that one fact or factor alone was the basis for its ruling. Instead, after taking into consideration all of the evidence before it, the court held Don did not intend to die intestate.

We hold the district court's conclusion that Mark presented sufficient evidence to rebut the presumption of revocation is supported by substantial evidence in the record. The district court applied the appropriate rules of law in its ruling that the copy of Don's will which he executed on August 15, 2012 be filed and admitted into probate. We therefore affirm the decision of the district court.

**AFFIRMED.**