IOWA WESLEYAN COLLEGE, Mount Pleasant, and BAPTIST CHURCH, Lockridge, appellants, v. LOIS M. JACKSON et al., appellees.

No. 49224.

(Reported in 86 N.W.2d 126)

92

November 12, 1957.

Stuart & Stuart, of Chariton, for appellant Iowa Wesleyan College.

A. V. Hass, of Chariton, R. E. Killmar, of Osceola, and Elton Johnston, of Corydon, for appellees Lois M. Jackson, Tedford W. Miles, Arno Tedford Naeckel, Lynn Miles Naeckel, and T. W. Miles, administrator.

Smith, J.—Winifred Miles Carter, of Corydon, Iowa, who died August 5, 1955, executed a will in 1952 which was left in her possession. It has not been found since her death though ample search has been made therefor. The trial court held the evidence sufficient to prove its execution and contents but insuf-

ficient to establish testatrix had not revoked it. A decree for defendants was entered. Plaintiffs have appealed. Defendants are the legal heirs of decedent.

Mrs. Carter was widow of H. H. Carter who had been a judge of the Third Iowa Judicial District. They had no children and left no direct heirs. He died in March 1941, leaving a will which gave her all his property. Both were graduates of plaintiff college and devoted attendants at every commencement time and she continued to attend those exercises regularly after his death. He was for many years member of the College Board of Trustees and its chairman when he died. His portrait was displayed in the corridor of the chapel. He and Mrs. Carter many times discussed the disposition of their property and talked of leaving everything to the college where "it would do the most good for young people."

After his death decedent made annual contributions to the college Living Endowment Fund and frequently talked of expecting to make a substantial contribution to the college sometime.

The record establishes that Mrs. Carter executed three wills in 1941, 1942 and 1952 respectively. All were drawn by Wesley V. Hart, Judge Carter's former court reporter and present reporter for Judge T. W. Miles, present judge of the same judicial district and Mrs. Carter's nephew. Judge Miles was named executor in each will and was Mrs. Carter's close financial adviser.

Mr. Hart is an accredited attorney and was an intimate friend and associate of both Judge and Mrs. Carter. That relationship continued between him and Mrs. Carter after Judge Carter's death. He was the witness, by whose testimony principally the execution and terms of Mrs. Carter's wills were established. Each will was witnessed by Mr. Hart and Mrs. Nina West, a friend and near neighbor of the decedent. She also testified to the execution of the several instruments.

All were alike in naming plaintiff college as residuary beneficiary after various somewhat minor (but really rather substantial) gifts, principally to various churches and schools. The exact details are unimportant here. Judge Carter's maiden sister, Jessie Carter, and niece, Catherine Kelley, were remembered ($5000 to each) in the first will, as was decedent's sister, Lois

Jackson (with a devise of the Carter home in Corydon, Iowa). The final will (after Jessie's death) omitted provisions for the first two and provided for Lois Jackson (in addition to the devise of the home) a bequest of $150 per month for life, to be paid out of a residuary trust in favor of plaintiff college. Judge Miles was named as trustee, "with power and authority to exercise (sic) the trust in any way he saw fit."

After the second will was executed the earlier one was meticulously destroyed, as was the second after execution of the third. Each was left in Mrs. Carter's possession but the third has not been found since her death. It is the one here sought to be established.

The first will had given her sister, Lois Jackson, who lived in California, Mrs. Carter's home in Corydon, Iowa, "and its contents." The principal purpose of the second will was to change this provision to read "home in Corydon and its furnishings and personal effects" to avoid a possible construction of the word "contents" to include any money, stocks or bonds which might be in the home. "Owing to the situation in California I do not want them to get their hands on any money." Nevertheless when the third will was being drawn and she was asked if she wanted the devise of home left in, she responded: "I do not know whether it is wise or not. They may turn it into money and run through it, they do not know the value of a dollar, but if she wants it that way, it will be a roof over her head."

Something is also made of the fact that each will contained some provision for disposition of decedent's collection of frosted circle pattern glassware: "It is impossible to imagine her allowing her beloved glassware to go under the auctioneer's hammer", according to plaintiffs' argument.

The record is replete with testimony of Mrs. Carter's general good health; the high esteem in which she was held; and that she was careful, methodical, reserved, conservative and independent in her business and personal affairs and definite in her opinion, but "not one to arbitrarily force her opinions upon others."

She is described by appellants as "not one to confide and consult any further than necessary. Her wills were discussed only with the scrivener, her investments only with T. W. Miles. She collected the rents and ran the farms herself. Her social ac-

quaintances knew little of her personal or business affairs. * * * She was consistent, conservative and concerned and not the type of person to destroy her life's plans and die intestate with no regard for the disposition of her property."

The foregoing fairly includes the considerations upon which plaintiffs ask reversal. It is based largely upon testimony of Mr. Hart but also upon that of other friends of Mrs. Carter who knew her intimately. It is confidently and ably argued by plaintiffs' attorneys as being adequate to support their claim. Before appraising it to determine its sufficiency we need to determine first the burden that rests upon plaintiffs.

■ I. It is to be remembered this is a probate case triable at law. We do not attempt to weigh the evidence to determine its preponderance. Our duty is merely to determine its sufficiency to overcome a presumption. The trial court is in the position a jury would occupy in that respect were it triable to a jury whose judgment upon conflicting testimony is conclusive. Citation of authorities at this point is hardly necessary, but see Coulter v. Petersen, 218 Iowa 512, 255 N.W. 684, and authorities cited; Goodale v. Murray, 227 Iowa 843, 856, 289 N.W. 450, 126 A. L. R. 1121.

■ II. Plaintiffs' burden is even more difficult than in the ordinary case. They confront a *presumption of law* which requires much more than a preponderance of evidence to overcome. And they are compelled to rely on circumstantial evidence. Under the record here the document was left in Mrs. Carter's possession after a codicil was executed in June 1955 and has not been found since her death although a most exhaustive search for it has been made.

Under these circumstances a presumption arises that Mrs. Carter destroyed the will with intent to revoke it. And the burden of one seeking to establish the will and overcome the presumption is to produce clear, satisfactory and convincing evidence to the contrary. Goodale v. Murray (supra), 227 Iowa 843, 856 et seq., 289 N.W. 450, citing In re Estate of Thorman, 162 Iowa 237, 144 N.W. 7, Ann. Cas. 1916B 484; 2 Elliott on Evidence, section 1452; Thompson on Wills, Second Ed., 1936, section 205; Atkinson on Wills, 1937, section 186, page 482;

Schouler on Wills, Executors and Administrators, Sixth Ed., section 788; Gardner on Wills, section 99; Page on Wills, Second Ed., section 796.

In Thomas v. Thomas, 129 Iowa 159, 160, 105 N.W. 403, it is said: "It appearing that a will, conceded to have been executed, cannot be found after the death of the testator, the presumption arises that the same was destroyed by him animo revocandi. And the burden is upon the party seeking to establish the will to overcome such presumption by evidence strong, positive and free from doubt. McCarn v. Rundall, 111 Iowa 406; Collyer v. Collyer, 110 N. Y. 481 (18 N.E. Rep. 110, 6 Am. St. Rep. 405); Stetson v. Stetson, 200 Ill. 601 (66 N.E. Rep. 262, 61 L. R. A. 258); Newell v. Homer, 120 Mass. 277; Thornton on Lost Wills, Sec. 56."

■ True the burden of proof must not be held prohibitive or impossible to carry. In Goodale v. Murray, supra, the showing was held sufficient to overcome the presumption. Undoubtedly circumstantial evidence alone *may* be sufficient. But something more than mere preponderance must be established. The presumption may even be strengthened or aided by direct or circumstantial evidence which standing alone would not support a holding the will had been revoked.

III. We have already tried fairly to summarize plaintiffs' evidence, and have thus far assumed that the presumption the will had been revoked stood unsupported by any evidence and opposed by the strong inferences based upon Mrs. Carter's training and character, her own and her husband's loyalty to plaintiff college, and her strong expressions of intention to do something substantial for it in the future.

But this is not the entire picture presented to the trial court. There is testimony tending to *support* the presumption that decedent had revoked the will. Mrs. Nell Streeter was Mrs. Carter's friend and long-time acquaintance. She testified to a conversation with Mrs. Carter in July 1955 concerning a quilt Mrs. Carter had previously given her: "I told her that I certainly appreciated the gift * * * and I felt * * * that I shouldn't have it, it belonged to her family. She said for me not to feel that way at all, that her family so far as she was concerned were well taken care of, she was leaving them everything she had."

And Earl Calbreath, a second cousin of Mrs. Carter, testified to a conversation in June 1955 in which he told her he had no will. The following month they had a second talk: "She says 'Earl, that visit I had last month—did me a lot of good * * * I don't have any will now.' She had never mentioned her will to me before." And she told Mrs. Lillian Rogers upon her return from the 1955 commencement: "Lillian, this is my last trip to Mt. Pleasant."

Plaintiffs minimize the testimony of these witnesses. But we must remember the trial court heard and saw them and its duty was to give their testimony such credence as it merited. The court did express this opinion of one of them: "Mrs. Streeter, by her testimony, demonstrated that she was definitely partisan, and while the Court does not think she has been impeached, the Court does feel that while very little credence can be given to her testimony it certainly cannot be entirely ignored."

Concerning Mr. Calbreath's testimony, the court merely comments: "Apparently this is the only time Mrs. Carter ever made any statement to the witness concerning her property or concerning any will." And it is possible the remark to Mrs. Rogers did not indicate any dissatisfaction with plaintiff college.

The trial court, with obvious reluctance, found that "if there was nothing except the legal presumption * * * this Court would be very hesitant in deciding the proponents had not met the burden placed upon them under the law. However, the other factors involved in this case, when considered with the legal presumption, compel the Court to hold the proponents in this case have not met the burden, and the Court must find that the will has been revoked by some act of Mrs. Carter and * * * on August 5 she died intestate."

■ IV. If Mrs. Carter did not intentionally revoke her will, one possible explanation of its nonappearance might be some inadvertent act by her. But that would be foreign to her nature and orderly habits, as would be a final decision by her to leave no will, after all her planning and former thinking: "Any time she wanted anything she could go right to it." An inadvertent loss or destruction of her will by her was perhaps more improbable than a change of her mind as to the disposition of her property after death.

But the purpose of the presumption we have adverted to is doubtless also to meet conjectures as to possible acts of interested persons other than the maker of the nonappearing will. There is no hint in record or brief that casts suspicion on Judge Miles, the only one who conceivably might have had access to the will during Mrs. Carter's life or after her death. Nor does the record reveal that any person, other than decedent, ever saw the instrument after the codicil was added on or about June 6 or 7.

Judge Miles says that in January 1955, before leaving for California, she showed him a table with a compartment under the top which had to be lifted or turned in order to get into it. She told him "if something should happen to me, if you will look in that table, I think you will find some instructions."

That was naturally a place searched promptly after her death but no "instructions" and no will was found. There are doubtless more details that could properly be mentioned but we have given, or at least tried to give, a fair summary of the record.

Things of the spirit and mind are difficult to ascertain and interpret. The parties here have done a competent job of presentation and so far as we can see have canvassed all the possibilities and probabilities—even conjectures—of the situation. They have been fair and helpful to us while valiantly fighting as lawyers should.

The rule establishing a presumption that the will, left in testator's custody and not found at his death has been revoked, is practical and necessary. We think the trial court here has properly interpreted and applied it, and the decision is affirmed.—Affirmed.

All JUSTICES concur.