In the Matter of the ESTATE of Floyd H. CROZIER, Deceased.

Byron D. CROZIER, Appellee,

v.

Inez DOYLE et al., Appellants.

No. 56894.

Supreme Court of Iowa.

Aug. 29, 1975.

Davis W. Moore, Jr., Denver, Colo., and Mullin, Mullin, McLaughlin & Harvey, Creston, Iowa, for appellants.

Jones, Cambridge, Carl, Feilmeyer & Landsness, Atlantic, for appellee.

Submitted to MOORE, C. J., and MASON, REES, HARRIS and McCORMICK, JJ.

MASON, Justice.

Byron D. Crozier filed his petition in probate seeking to establish and have admitted to probate an alleged lost will of his brother, Floyd, who died January 11, 1972. Floyd had executed a will May 17, 1958. Following his death a thorough search failed to disclose any executed will, although an unsigned carbon copy of the 1958 will was found among decedent's belongings.

The petitioner, Byron D. Crozier, was the residuary beneficiary under the 1958 will and named executor. Defendants are the

other heirs at law and administrators of the estate of Floyd H. Crozier. They appeal from an adverse ruling.

■ It has been uniformly held by this court and courts generally that to establish a lost will it is incumbent upon the proponent to prove by clear, satisfactory and convincing evidence (1) due execution and former existence of the alleged will (2) that it has been lost and could not be found after diligent search (3) that the presumption of destruction by decedent with intent to revoke it, arising from its absence at death, has been rebutted, and (4) contents of the will. The evidence need not be free from doubt. *Goodale v. Murray,* 227 Iowa 843, 856–857, 289 N.W. 450, 456–457, 126 A.L.R. 1121; *In Re Estate of Lawrence,* 251 Iowa 305, 309, 100 N.W.2d 645, 646; *In Re Estate of Givens,* 254 Iowa 1016, 1019, 119 N.W.2d 191, 193; *In Re Estate of Hasselstrom,* 257 Iowa 1014, 1017, 135 N.W.2d 530, 533; *In Re Estate of Hoxsey,* 225 N.W.2d 141, 142 (Iowa 1975); and authorities cited in these opinions.

■ This action was triable in probate as one at law without a jury. Our review is not de novo but only upon the errors assigned.

The trial court found Byron had established by clear, satisfactory and convincing evidence first, the execution of the will, second, the fact the will could not be found though a diligent search had been made, and third, the will's provisions. A fourth element—evidence to rebut the presumption the will, when not found, had been revoked by decedent—gave the court more trouble. Nevertheless, it was held the presumption had been rebutted.

It is uncontradicted Floyd contacted Atlantic attorney Ray Yarham concerning the making of his will. May 17, 1958, in the presence of Mr. Yarham and the attorney's secretary, Lucille Conn, Floyd duly executed and signed a will which left the major portion of his estate to Byron. Floyd received the original and a duplicate copy. The remaining carbon copy was retained by the attorney. Both copies were unsigned, although Mrs. Conn later penciled in the names for record keeping purposes. Yarham furthermore warned Floyd to keep the will in a safe place so that it would not be destroyed by fire.

Floyd, a lifetime bachelor, had always lived on the original family homestead. While the farm home was destroyed by fire January 6, 1966, the will somehow survived the catastrophe, as Floyd filed a will with the Cass County Clerk January 10 of the same year.

Shortly after the fire, Floyd moved in with Byron and his wife where he remained free of charge (at Byron's insistence) until March 15, 1966. From there he lived for a short while in an old house on the homestead and finally moved into a cave on the property, which was Floyd's last place of abode.

Why he removed himself from the relative comforts of Byron's home to the cave may be answered by the fact Floyd lost some money from a closet in his brother's house. In this regard he contacted Yarham in his capacity as county attorney when Floyd also complained of shortage in his accounts at the Whitney Bank in Atlantic and the State Bank at Anita. The trial court found an investigation revealed no shortage at the banks.

For reasons undisclosed, Floyd signed for and removed a will from the clerk's office June 6, 1966. Sometime after this, Floyd misplaced his will, according to the testimony of Frank Henry Martin, who stated decedent sometime in May 1971, told him he had lost his will. The appendix indicates Martin informed decedent his lawyer or banker could make a copy of the will. In another conversation in late July or early August, Floyd stated he was "getting something done" about the "will deal" and thanked Martin for the advice. Floyd did not indicate just what he was getting done nor did he reveal any particulars about the will. In this regard, the abstract of Mar-

tin's testimony is somewhat at odds with the trial court's findings in that the court found Martin stated he did not know about the will and that Floyd should see his attorney.

May 26, 1971, Floyd also discussed his estate with Paul Krause, a lifetime acquaintance, regarding the tax consequences of leaving his estate to Byron, which would pass at Byron's death to his two sons. Floyd was concerned the estate would thereby be taxed twice. Krause told Floyd he did not know the answer. Floyd did not say what he would do and the matter was never mentioned again.

At Floyd's death Byron made the funeral arrangements and paid the costs. All of decedent's papers were moved to the home of Leonard Crozier, Byron's son, where Leonard, Byron and Byron's other son, Ralph, searched for the will. While the original was not found, the search did reveal the carbon copy of the 1958 will. On the front page was written "will" which Ralph testified was in Floyd's handwriting. There were, however, no signatures.

A further search was made of all buildings at the homestead and inquiries were made of the area attorneys and banks. While other items were found, the original copy of the will was not.

January 17, 1972, upon the advice of Mr. Yarham, Byron petitioned to open the estate under the laws of intestacy. However, April 25, 1972, as stated, Byron filed a petition to probate a lost will, which, in turn, precipitated the events leading to this appeal.

At the close of petitioner's evidence and again at the close of all evidence defendants moved for directed verdict. The trial court reserved ruling on these motions until counsel had completed their arguments and then took the matter under advisement. In its findings of fact and conclusions of law the court also overruled the motions to direct. The court concluded the facts were "inconsistent with and repugnant to an intention" to die intestate or revoke the will.

After the court filed its findings of fact defendants filed a combined motion for new trial and a re-examination of the findings of fact, conclusions of law and ruling on motion for directed verdict which they later amended. The court denied defendants' motion.

The issues presented for review by this appeal stem from defendants' contentions: (1) the trial court erred in holding proponent had established by clear, satisfactory and convincing evidence the four elements necessary to rebut the presumption decedent's will was destroyed and to grant the relief sought and also erred in overruling defendants' motions for a directed verdict and for a new trial; and (2) the trial court erred in placing evidentiary weight on the following:

A. The discovery of the unexecuted carbon copy of the will found in decedent's quarters which had the word "will" written at the bottom of the first page.

B. The close relationship between decedent and his brother the last month of decedent's life.

C. Byron's testimony concerning the fact he would be responsible for decedent's funeral expenses.

I. Defendants rely on the rule recognized in *Goodale v. Murray,* 227 Iowa at 862–863, 289 N.W. at 459 and in *In Re Estate of Givens,* 254 Iowa at 1021–1022, 119 N.W.2d at 194, that the burden of proof of nonrevocation is on the proponent of a lost will shown to have been duly executed and in the possession of, or readily accessible to, the testator or which was not shown to have been in the possession of another at the time of its loss, in order to overcome the rebuttable presumption of revocation which prevails in such instances.

Thus, the immediate problem is the sufficiency of the evidence rebutting the presumption of revocation by decedent. This court has on numerous occasions discussed the presumption.

*In Re Estate of Givens,* 254 Iowa at 1022–1023, 119 N.W.2d at 194–195, has this statement:

" \* \* \* The so-called presumption of revocation seems, in truth, to be really an inference of fact drawn from the inability to locate a will which was last known to have been in the possession of the testator or to which he had ready access; and generally it is a fact question as to whether the presumption, or inference, has been overcome. The presumption is not conclusive, and may be rebutted; it is not a burden impossible to carry.

"However, it must be carried by evidence stronger than a mere preponderance. We quote from *Iowa Wesleyan College v. Jackson,* 249 Iowa 91, 95, 86 N.W.2d 126, 129:

" 'Plaintiffs' burden is even more difficult than in the ordinary case. They confront a *presumption of law* which requires much more than a preponderance of the evidence to overcome.

" ' \* \* \* And the burden of one seeking to establish the will and overcome the presumption is to produce clear, satisfactory and convincing evidence to the contrary.' \* \* \*." (Emphasis in the original quote).

The court in *Iowa Wesleyan,* 249 Iowa at 96, 86 N.W.2d at 129, continued: "True the burden of proof must not be held prohibitive or impossible to carry. In *Goodale v. Murray,* supra, the showing was held sufficient to overcome the presumption. Undoubtedly circumstantial evidence alone *may* be sufficient. But something more than mere preponderance must be established. The presumption may even be strengthened or aided by direct or circumstantial evidence which standing alone would not support a holding the will had been revoked." (Emphasis in original).

■ Likewise, the presumption may be overcome by proof of declarations made by decedent, " \* \* \* by proof of the circumstances of the testator, or of his relations to the persons involved. \* \* \* [citing authorities]." *Goodale v. Murray,*

227 Iowa at 863, 289 N.W. at 459, 126 A.L.R. at 1134.

There is good reason why the burden of proof on the part of a lost will proponent should not be prohibitive. "Wills are carelessly lost and misplaced and a reasonable opportunity should be given to establish such a will. Likewise wills are sometimes suppressed or destroyed for an ulterior purpose. The defeat of that purpose ought not be made too difficult or impossible. \* \*." *Goodale,* 227 Iowa at 869, 289 N.W. at 463, 126 A.L.R. at 1138.

■ Thus, the question whether the presumption of revocation has been rebutted is one of fact which must be proved by clear and convincing evidence—by more than a "mere preponderance" but less than by beyond a reasonable doubt. The trial court, sitting as would a jury, determined upon the instant facts the proponent had satisfied his burden.

■ The trial court's decision on the facts has the force and effect of a jury verdict. The credibility of witnesses and weight of evidence is for the trial court. If supported by any substantial evidence the trial court's findings of fact are binding on this court. Of course, this is true only if in reaching them the court applied proper rules of law. *In Re Estate of Lawrence,* 251 Iowa at 308–309, 100 N.W.2d at 648; *In Re Estate of Givens,* 254 Iowa at 1020, 119 N.W.2d at 193; *In Re Estate of Hasselstrom,* 257 Iowa at 1018, 135 N.W.2d at 533; *In Re Estate of Hoxsey,* 225 N.W.2d at 142.

The trial court recognized defendants had aided the presumption the will of the decedent had been intentionally revoked by him by establishing that at the time decedent stayed in Byron's home some of decedent's money became missing and that decedent complained to Mr. Yarham in his capacity as county attorney and to Byron's son, Ralph, and sometime later to Byron's wife, Lena. The court also gave consideration to the additional fact that after decedent had stayed at Byron's home he did remove his

will from the clerk's office of Cass County, signed the receipt therefor and took the will back into his possession.

At the risk of some repetition, the following acts and declarations of decedent were held sufficient to rebut the presumption: (1) Although Floyd removed his will from the county clerk's office after complaining of the lost money, as of May 1971, the will had not as yet been revoked since Floyd informed Frank Martin the will was lost— not that it was revoked; (2) Floyd's inquiries of Mr. Krause as to the tax consequences of leaving the estate to Byron indicated he had in mind the testamentary disposition already provided for and that he intended to leave the majority of his estate to Byron. Consequently, as of May 26, 1971, "it was the intent of the decedent to have his property pass under his Will to the brother, and refutes any contention by the Defendants that the Will prior to that time had been revoked"; (3) There was no evidence Floyd contacted an attorney concerning the loss of the will after being so advised by Frank Martin and the court thought it significant Martin had stated Floyd could probably get a copy; (4) In this regard, Floyd told Martin in July, 1971, he appreciated the advice and was getting something done about the "will deal"; (5) The fact the copy was found in the buffet drawer, with the word "Will" written at the bottom of the first page in Floyd's handwriting was significant. The trial court stated:

" * * * Although there is no evidence as to when this handwriting was placed on the copy, yet it should be noted that Mr. Martin having advised the decedent that he could no doubt get a copy of the Will, the decedent could very well have considered this copy as his Will, by writing the term 'Will' at the bottom of the page and declaring his intent, again, that the terms of the Will as shown by the copy, were to remain effective. Evidently, the decedent thought he had the problem of his lost Will solved, as he indicated to Mr. Martin that he was doing something about it, and thanked Mr.

Martin for his advice. It would appear that if the decedent had intentionally revoked the original Will of May 17, 1958, he would have destroyed the copy, or at least would not have kept it in the safest place that he had to keep papers * * *, the buffet drawer."

The trial court also ascertained other facts which served to weaken and overcome the presumption. In reality, these facts related to Floyd's circumstances and relations with the persons involved. There was the close relationship between Floyd and Byron's family. As the only nearby relatives, and the only ones Floyd ever mentioned, they were called upon when decedent needed any help, groceries or errands run. The parties celebrated Christmas of 1971 together at Ralph's home. There was no evidence Floyd ever made disparaging remarks about his brother or nephews. Byron made the funeral arrangements and indicated he would be responsible for the costs thereof.

Finally, the court found it significant that while Floyd had other relatives, the will itself provided only for his sister and one nephew, with the residue left to Byron. Nothing indicated a change of circumstances evidencing a closer affinity to these other relatives. As it was, Floyd's advancing age generated an even greater dependence upon Byron's family.

Defendants concede the presumption of revocation may be rebutted but insist in order to establish a lost will the presumption of revocation by decedent during his lifetime must be overcome by clear, satisfactory and convincing evidence. They assert this means there must be no reasonable or well founded doubt the proponent has proven the will lost rather than destroyed and take the position the trial court's findings of fact, conclusions of law and ruling on motion for directed verdict were based on pure speculation and assumption not borne out in the record and that the evidence was insufficient as a matter of law to overcome the presumption of revocation.

Before proceeding further we dispose of defendants' contention the evidence must leave *no reasonable or well founded doubt* the proponent has proven the will lost. In *Thomas v. Thomas*, 129 Iowa 159, 160, 105 N.W. 403, this court said the presumption of revocation in the case of a lost will must be overcome "by evidence strong, positive, *and free from doubt.*" In *Goodale v. Murray*, 227 Iowa at 869, 289 N.W. at 462, this court said, "The italicized words have never been repeated in any later decision of this court. The writer does not recall of any such requirement in any decision. * * * In his work on Wills, [section 186, p. 455] Arkinson says: 'While the evidence must be full and satisfactory, it need not be such as to remove all reasonable doubt.' * * *

"The words 'free from doubt' impose a still heavier burden and one that is unwarranted, and to that extent *Thomas v. Thomas*, supra, is overruled."

As stated, our cases, with the exception of a statement appearing in *Iowa Wesleyan College v. Jackson*, 249 Iowa at 96, 86 N.W.2d at 129, have consistently held the evidence need not be free from doubt.

■ In support of their contention that the evidence was insufficient as a matter of law defendants argue that when reasonable time elapses after knowledge of the destruction, coupled with opportunity to reproduce the destroyed will, a presumption of revocation arises and the will cannot be admitted to probate. Defendants also declare that where the will is lost or destroyed while in testator's possession, the loss or destruction must be without his knowledge or the presumption of revocation is not overcome.

Defendants cite *In Re Thomas' Estate*, 274 Mich. 10, 263 N.W. 891; *Campbell v. Cavanaugh*, 95 N.J.Eq. 724, 125 A. 569; *In Re Lawrence's Will*, 138 N.J.Eq. 134, 47 A.2d 322; *Appeal of Deaves*, 140 Pa. 242, 21 A. 395; *Parsons v. Balson*, 129 Wis. 311, 109 N.W. 136; and *In Re Rokfsky's Will*, Sur., 111 N.Y.S.2d 553, in support of this contention.

We have studied the foregoing cases and examined the following annotations in 34 A.L.R. 1304, 79 A.L.R. 1493, 99 A.L.R. 524, 126 A.L.R. 1139, 3 A.L.R.2d 949, 17 A.L.R.2d 805, and 81 A.L.R.2d 1112, where these cases are cited and conclude the great weight of authority is to the effect that the presumption of revocation by decedent of a lost will which was duly executed is not conclusive and so may be overcome by sufficient evidence.

*Campbell v. Cavanaugh* is discussed in *In Re Will of Roman*, 80 N.J.Super. 481, 194 A.2d 40, 42, where the court makes reference to a severe criticism of *Campbell's* logic.

In the alternative defendants contend in the event this court decides not to follow the principles stated in the cases cited by them failure of decedent to make a new will when he had ample opportunity to do so over a period of eight months must be regarded as at least some evidence he was dissatisfied with the provisions of his existing will and therefore revoked it.

■ Conceding such evidence could be relevant to the issue of revocation the weight of the evidence is for the trier of facts, in this case the trial court, to determine. The so-called presumption of revocation is an inference of fact and not a conclusion of law. See the statement from *In Re Estate of Givens*, 254 Iowa at 1022–1023, 119 N.W.2d at 194–195, set out earlier in this opinion.

■ We are not prepared to say as a matter of law the evidence was insufficient to rebut the presumption of revocation or that the trial court applied erroneous rules of law in reaching its determination the copy of the last will and testament of Floyd H. Crozier executed May 17, 1958, be filed with the clerk of the Adair District Court and admitted to probate as and for the last will and testament of the decedent.

In reaching our determination we have considered each and every contention and

argument urged by defendants whether specifically referred to or not.

The case is therefore—Affirmed.